Martin J. Mayer – SBN #73890
mjm@jones-mayer.com
Kimberly Hall Barlow – SBN #149902
khb@jones-mayer.com
Paul R. Coble – SBN # 128173
**JONES & MAYER**
3777 North Harbor Boulevard
Fullerton, CA 92835
(714) 446-1400 Telephone
(714) 446-1448 - Facsimile

Norman J. Watkins – SBN #87327
nwatkins@lynberg.com
S. Frank Harrell – SBN#133437
sharrell@lynberg.com
Shannon L. Gustafson – SBN #228856
sgustafson@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
333 City Boulevard West, Suite 640
Orange, California 92868-5915
(714) 937-1010  Telephone
(714) 937-1003  Facsimile

Attorneys for Defendants, COUNTY OF ORANGE and MICHAEL S. CARONA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM J. HUNT, | CASE NO. SACV07-705 MMM (MLGx) |
| Plaintiff, | **ORANGE COUNTY DEFENDANTS' TRIAL BRIEF** |
| vs. | |
| COUNTY OF ORANGE; MICHAEL S. CARONA; and DOES 1 to XX, Inclusive, | |
| | *Trial Date:  October 13, 2009* |
| Defendant, | *Orig. Complaint Filed:  June 18, 2007* |

1

# <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    STATEMENT OF FACTS ......................................................................... 4

III.   THE KEY ISSUES IN THIS LITIGATION ARE FOR THE COURT
       RATHER THAN THE JURY .................................................................... 6

IV.    PLAINTIFF'S FIRST AMENDMENT - BASED 42 U.S.C. § 1983
       CLAIM IS BARRED BY THE ELROD - BRANTI RULE ........................10

V.     HUNT'S FIRST AMENDMENT - BASED 42 U.S.C. § 1983 CLAIMS
       AGAINST DEFENDANTS ARE BARRED BY THE PICKERING
       BALANCING TEST ................................................................................17

V.     DEFENDANT CORONA IS SHIELDED BY QUALIFIED
       IMMUNITY ...........................................................................................19

VI.    PLAINTIFF WAS PREVENTED BY THE HATCH ACT FROM
       RUNNING FOR ELECTIVE OFFICE .....................................................24

VII.   CONCLUSION .......................................................................................24

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1

## **TABLE OF AUTHORITIES**

2

3

## **CASES**

4  Adams v. St. Lucie County Sheriff's Dept, 962 F.2d 1563, 1575 (11th Cir. 1992)...20

5  Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987) .................20, 21

6  Bauer v. Bosley, 802 F.2d 1058 (8th Cir. 1986)....................................................15

7  Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S. Ct. 574 (1946)......24

8  Biggs v. Best, Best & Krieger, 189 F.3d 989, 994-995 (9th Cir. 1999) ..............8, 17

9  Biggs v. Best, Best & Krieger, 189 F.3d 989, 997 (9th Cir. 1999) ...................12, 14

10  Billingsley v. St. Louis County, 70 F.3d 61, 64 (8th Cir. 1995) ............................22

11  Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. Cal. 2007) ................ 7

12  Branti v. Finkel, 445 U.S. 507, 517, 100 S. Ct. 1287 (1980) ...........................passim

13  Brewster v. Board of Educ., 149 F.3d 971, 979-980 (9th Cir. 1998) ................passim

14  Carroll v. City of Phoenix, 2007 U.S. Dist. LEXIS 28749 (D. Ariz. 2007) .............12

15  Cochran v. City of Los Angeles, 222 F.3d 1195, 1201 (9th Cir. 2000)...................11

16  Collins v. Jordan, 110 F.3d 1363, 1369 (9th Cir. 1996 .......................................8, 21

17  Connick v. Myers, 461 U.S 138, 151, 103 S.Ct. 1684 (1983)........................passim

18  Cutcliffe v. Cochran, 117 F.3d 1353 (11th Cir. 1997) ..........................................15

19  Dart Industries, Inc. v. Liberty Mut. Ins. Co., 484 F.2d 1295, 1298 (9th Cir. 1973) 24

20  Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012 (1984) .............................3, 19

21  DiRuzza v. County of Tehama, 206 F.3d 1304, 1306 (9th Cir. 2000) ..............11, 12

22  Elrod v. Burns, 427 U.S. 347, 367, 96 S. Ct. 2673 (1976) ..............................passim

23  Eng v. Cooley, 552 F.3d 1062, 1072 (9th Cir. 2009)................................................ 8

24  Faughender v. City of North Olmsted, 927 F.2d 909 (6th Cir. 1991) .....................15

25  Fazio v. City & County of San Francisco, 125 F.3d 1328, 1333 (9th Cir. 1997)
    .........................................................................................................................passim

26

27  Flynn v. City of Boston, 140 F.3d 42, 46 (1st Cir. 1998) ..................... 10, 14, 21, 25

28  Ganwich v. Knapp, 319 F.3d 1115, 1125 (9th Cir. 2003).......................................20

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1  Gray v. County of Tulare, 32 Cal. App. 4th 1079 (1995) ...................................7, 11

2  Green v. Henley, 924 F.2d 185 (10th Cir. 1991) .....................................................15

3  Hall v. Ford, 856 F.2d 255, 263 (D.C. Cir. 1988)..........................................2, 10, 19

4  Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727 (1982) .....................19, 20

5  Hawkins v. Steingut, 829 F.2d 317, 320 (2d Cir.1987) ..........................................21

6  Hobler v. Brueher, 325 F.3d 1145, 1150-1151 (9th Cir. 2003)...........................7, 17

7  Hogan v. City of Syracuse, 2007 U.S. Dist. LEXIS 23675 (N.D.N.Y 2007) .....11, 16

8  Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534 (1991) ...................................20

9  Jenkins v. Medford, 119 F.3d 1156, 1164-65 (4th Cir. 1997)...........................passim

10  Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241 (1st Cir.1986)........15, 21

11  Kennedy v. Ridgefield City, 439 F.3d 1055, 1065 (9th Cir. 2006) .......................... 7

12  Keyser v. Sacramento Unified School Dist., 265 F. 3d 741, 743 (9th Cir. 2001)......17

13  Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986) ..............................8, 23

14  McBee v. Jim Hogg County, 703 F.2d 834, 839 (5th Cir. 1983) .............................14

15  McDermott v. Pataki, 1996 U.S. Dist. LEXIS 15338, 15-16 (N.D.N.Y. 1996)........22

16  Mendoza v. Block, 27 F.3d 1357, 1361 (9th Cir. 1994) ..........................................20

17  Menotti v. City of Seattle, 409 F.3d 1113, 1131 (9th Cir. 2005) .............................18

18  Mirch v. City of Troy, 2002 U.S. Dist. LEXIS 6467, 11-12 (N. D. N. Y. 2002)......22

19  Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806 (1985)...............................21

20  Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000) ....................................2, 7, 19

21  O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S. Ct. 2353 (1996)
   ..........................................................................................................................11

22  Peters v. Delaware River Port Auth., 16 F.3d 1346 (3d Cir. 1994)..........................15

23  Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731(1968) .....8, 9, 17

24  Quon v. Arch Wireless Operating Co., 2006 U.S. Dist. Lexis 61612 (C.D. Cal.
   2006) ..................................................................................................................20

25

26  Rankin v. McPherson, 483 U.S. 378, 386, n.9, 107 S. Ct. 2891 (1987)...............9, 18

27  Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S. Ct. 2729, 2739 (1990) .11, 16

28

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

2e24d6ac2fc897e0

1  <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S. Ct. 2151 (2001)...................................2, 3, 7

2  <u>Selch v. Letts</u>, 5 F.3d 1040 (7th Cir. 1993) ..............................................................15

3  <u>Susag v. City of Lake Forest</u>, 94 Cal. App. 4th 1401, 1412 (2002) .........................24

4  <u>Tomczak v. City of Chicago</u>, 765 F.2d 633 (7th Cir. 1985)......................................15

5  <u>Tortu v. Las Vegas Metro. Police Dep't</u>, 556 F.3d 1075, 1085 (9th Cir. 2009)........10

6  <u>United States v. Lanier</u>, 520 U.S. 259, 117 S.Ct. 1219, 1225 (1997)...................3, 20

7  <u>Upton v. Thompson</u>, 930 F.2d 1209, 1218 (7th Cir. 1991) ............................9, 13, 16

8  <u>Voigt v. Savell</u>, 70 F.3d 1552, 1560-61 (9th Cir. 1995) ..........................................23

9  <u>Waters v. Churchill,</u> 511 U.S. 661, 673, 114 S.Ct. 1878 (1994) ..........................9, 18

10  <u>Wilbur v. Mahan</u>, 3 F.3d 214, 218 (7th Cir. 1993) .................................................9, 16

11  <u>Wilson v. Layne</u>, 526 U.S. 603, 618, 342 S. Ct. 821 (1999)....................................21

## **STATUTES**

13  <u>42 U.S.C. § 1983</u>......................................................................................10, 17

14  5 <u>U. S. C.</u> § 1502(a)(3)...........................................................................................24

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    PRELIMINARY STATEMENT**

The last election campaign for Orange County Sheriff was heated and personal. Plaintiff William Hunt led a dissident office faction which stridently attacked the program and policies of the incumbent candidate, Michael S. Carona.. By his own admission, Mr. Hunt exploited his high rank and prestigious assignment as Chief of Police Services in San Clemente to further his ambitions. Ironically enough, Sheriff Carona had given Hunt both his high rank and his prestigious position.

Ultimately, a wide majority of Orange County voters rejected Hunt's assertions, and returned Sheriff Carona to office. Sheriff Carona was, however,  left with the task of attempting to heal the political fractures in his office which had been exposed and inflamed during the campaign. Part of his efforts involved transferring Hunt to a new, less politically sensitive position within the Department.

Despite the incumbent Sheriff's plainly restrained response to Hunt's unsuccessful insurrection, Hunt has responded by filing this "civil rights" suit, which seeks nothing less than judicial micro-management of the Sheriff's Departments staffing decisions. Simply put, federal decisional law requires dismissal of Hunt's putative "civil rights" claims.

For many years, every Court to consider the matter -- including the federal Supreme Court -- has held that the nation's local elected officials should be accorded "wide discretion and control over the management of [their] personnel and internal affairs." <u>Connick v. Myers</u>, 461 U.S 138, 151, 103 S.Ct. 1684 (1983). Thus, courts nationwide have  repeatedly concluded that the goal of governmental efficiency justifies a rule permitting elected officials the option of terminating or transferring key deputies who express political opposition to their administration -- without violating First Amendment free speech principles. <u>See</u>, <u>Branti v. Finkel</u>, 445 U.S. 507, 517, 100 S. Ct. 1287 (1980) ("[Political] affiliation may be an acceptable

1  requirement for some types of government employment. Thus, if an employee's

2  private political beliefs would interfere with the discharge of his public duties, his

3  First Amendment rights may be required to yield to the State's vital interest in

4  maintaining governmental effectiveness and efficiency."); <u>Elrod v. Burns,</u> 427 U.S.

5  347, 367, 96 S. Ct. 2673 (1976)(Certain types of governmental employees "may be

6  fired for political reasons without offending the Constitution. . . to the end that

7  representative government not be undercut by tactics obstructing the implementation

8  of policies of the new administration, policies presumably sanctioned by the

9  electorate."); <u>see also,</u> <u>Hall v. Ford</u>, 856 F.2d 255, 263 (D.C. Cir. 1988)("High level

10 officials must be permitted to accomplish their organization objectives through key

11 deputies who are loyal, cooperative, willing to carry out their superiors' policies,

12 and perceived by the public as sharing their superiors aims. . ..")

13       Given these principles, and Hunt's admittedly heated campaign rhetoric,  the

14 incumbent Sheriff was simply not required to retain Plaintiff in the influential Chief

15 of Police post he occupied prior to the election. <u>See</u>, <u>Fazio v. City & County of San</u>

16 <u>Francisco</u>, 125 F.3d 1328, 1333 (9th Cir. 1997)("A public agency would be

17 unmanageable if its head had to . . . retain his political enemies . . . in positions of

18 confidence or positions in which they would be . . . exercising discretion in the

19 implementation of policy."); <u>Jenkins v. Medford</u>, 119 F.3d 1156, 1164-65 (4th Cir.

20 1997) (En banc)("We can think of no clearer way for a deputy to demonstrate

21 opposition to a candidate for sheriff, and thus actual or potential disloyalty once the

22 candidate takes office, than to actively campaign against the candidate[]. . ..")

23       At the absolute minimum, and as set forth in further detail below, Sheriff

24 Carona is entitled to qualified immunity as against Hunt's First Amendment claims.

25 <u>See</u>, <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S. Ct. 2151 (2001) (Discussing the pertinent

26 qualified immunity dismissal standards and sequence of their consideration); <u>Nunez</u>

27 <u>v. Davis</u>, 169 F.3d 1222, 1229 (9th Cir. 2000) ("Whether a public official is entitled

28

- 2 -
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1  to qualified immunity is a question of law.")

2      As the Court is aware, "[a] plaintiff who seeks damages for violation of

3  constitutional . . . rights may overcome the defendant official's qualified immunity

4  only by showing that those rights were ***clearly established*** at the time of the conduct

5  at issue *.*" Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012 (1984)(Emphasis

6  added.) "This inquiry, it is vital to note, must be undertaken in light of the specific

7  context of the case, not as a broad general proposition; and it too serves to advance

8  understanding of the law and to allow [government employee defendants] to avoid

9  the burden of trial..." Saucier v. Katz, supra, 533 U.S. at 200; see also, United States

10  v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 1225 (1997)(Qualified immunity "is simply

11  the adaptation of the fair warning standard to give officials… the same protection

12  from civil liability and its consequences that individuals have traditionally possessed

13  in the face of vague criminal statutes."; Both doctrines bar enforcement of  "a [law]

14  which either forbids or requires the doing of an act in terms so vague that men of

15  common intelligence must necessarily guess at its meaning and differ as to its

16  application.")

17      Here, the Supreme Court and the Ninth Circuit have separately concluded that

18  First Amendment retaliation issues are singularly difficult to analyze and correctly

19  resolve -- even in the hands of experienced Article III judges. See, Brewster v.

20  Board of Educ., 149 F.3d 971, 979-980 (9th Cir. 1998)(Collecting cases). For this

21  reason, the Ninth Circuit has found that "the law regarding public-employee free

22  speech claims will rarely, if ever, be sufficiently clearly established to preclude

23  qualified immunity . . .." Id.(Citations omitted.) As set forth in further detail below,

24  the facts of Hunt's First Amendment free-speech claim fall comfortably within the

25  Ninth Circuit's general qualified immunity rule.

26  / / /

27  / / /

28
- 3 -
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1    II.    **STATEMENT OF FACTS**

2          In or about May 2003, Plaintiff, William J. Hunt began serving as the Orange

3    County Sheriff's Department's Chief of Police Services for the City of San

4    Clemente.  In this assignment, he supervised Sheriff's Department operations in San

5    Clemente, under the ultimate authority of the elected Orange County Sheriff. The

6    Sheriff was posted at the Department's headquarters in Santa Ana.

7          As Chief, Hunt worked at an office in San Clemente City Hall, overseeing a

8    staff of more than 50 Sheriff's Department employees. He interacted directly with

9    the public, as well as with City staff and officers, including the City Manager and

10   the City Council, regarding police services provided within the City. As the Chief,

11   Hunt also had broad authority to implement the Sheriff's operating policies in San

12   Clemente and represented the Department within the community and with the

13   media.  As summarized by Hunt, he was "responsible for directing the Orange

14   County Sheriff's Department services and day-to-day law enforcement operations

15   within the City of San Clemente and ensured that the applicable policies and

16   procedures of the Sheriff's Department were implemented."

17         Hunt ultimately decided to run against his supervisor, incumbent Orange

18   County Sheriff Michael Carona in the 2006 general election – even though Carona

19   had appointed Hunt to his prestigious post in San Clemente. During his campaign,

20   Hunt voiced heated and widely disseminated attacks on Sheriff Carona's

21   competence and policies. Hunt also disparaged and belittled a host of Sheriff's

22   Department employees – bluntly suggesting that everyone who had been promoted

23   by Sheriff Carona had received their position due to political crony-ism rather than

24   merit.

25         Hunt has acknowledged that the tenor of his campaign, and the vitriolic nature

26   of his charges all had a negative impact on the ability of the Sheriff's Department to

27   function.  Other high ranking officials in the Department shared the view that Hunt's

28                                        - 4 -

1  critical remarks affected the productivity and interpersonal relations within the

2  Department.

3      Hunt also abused his position during the campaign to access and disseminate

4  confidential personnel information. Specifically, Hunt openly commented on two

5  officer-involved death incidents involving mentally ill persons. [1]

6      After the electorate returned Sheriff Carona to office, an investigation of

7  Hunt's actions during the campaign was launched. As a result of the investigation,

8  Hunt was notified in writing of his intended demotion based on the fact that his

9  statements during his election campaign violated the Department's rules and

10 regulations. Before the discipline could be imposed on Hunt by the County, Hunt

11 abruptly retired on December 22, 2006. [2]

12     Hunt had the opportunity to address the electorate of Orange County in any

13 manner he chose – and he did so in the most abrasive and strident imaginable terms.

14 Having exercised his Constitutional rights to the full, Hunt now literally seeks to be

15 insulated from the consequences of his own decisions. Indeed, Hunt has now

16 brought this civil damages action, asserting that he has a "First Amendment" right to

17 retain his high ranking position – despite the undisputed election results, despite the

18 successful candidate's unquestioned right to surround himself with politically

19 compatible Lieutenants and despite Hunt's independent violation of Department

20 policies during the campaign. Put simply, Hunt misapprehends the law, and he

21 _____

22   [1] These comments asserted a lack of training by the Department of the involved
23 deputies, and a failure to properly equip them.  When pressed on this point during
   his internal affairs interview, Plaintiff admitted that he had no idea what training the
24 involved deputies did or did not have, and had no idea what, if any role, equipment
   played in either death.

25
26   [2] He did so without exercising any rights to appeal the Notice of Demotion and
   he has not sought any writ of administrative mandamus pursuant to California Code
27 of Civil Procedure § 1094.5.

28
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1 misapprehends the very nature of this lawsuit and how it is to be decided. As set
2 forth in further detail below, the key decisions in this case are to be made by the
3 Court, not the jury.  The Court should accordingly find in favor of the defense and
4 reject Hunt's invitation to rewrite pertinent Constitutional law.

5 III.    **THE KEY ISSUES IN THIS LITIGATION ARE FOR THE COURT**
6            **RATHER THAN THE JURY**

7           There are no actionable claims within Plaintiff's complaint.  No material
8 dispute exists that Hunt served as the Chief of Police Services for the City of San
9 Clemente, and was a member of management within the Orange County Sheriff's
10 Department.  Hunt does not deny that he ran for election against his department
11 head, then Sheriff Carona.  No material dispute exists that in the course of his
12 campaign for election Hunt made numerous statements highly critical of the
13 Sheriff's Department and of Sheriff Carona.  Hunt does not dispute that, in the
14 context of making these disparaging and critical remarks, he was holding himself
15 out as an experienced law enforcement manager and the equivalent of a municipal
16 chief of police. In point of fact during his own campaign comments, Hunt described
17 the position of Chief of Police Services as being a law enforcement executive.

18           As discussed more fully below, if Hunt was at relevant times a member of the
19 executive or management team of the Sheriff's Department, and if he ran for
20 election against the elected head of the Sheriff's Department, Hunt was subject to
21 _**outright termination**_ – let alone the demotion which was actually proposed in his
22 case. See, e.g., Fazio v. City & County of San Francisco, 125 F.3d 1328, 1333 (9th
23 Cir. 1997)("A public agency would be unmanageable if its head had to . . . retain his
24 political enemies . . . in positions of confidence or positions in which they would be
25 . . . exercising discretion in the implementation of policy.") Whether Hunt was a
26 member of the executive team subject to termination on political grounds is a
27 _**question of law**_ for the Court alone. See, Hobler v. Brueher, 325 F.3d 1145, 1150-

28
- 6 -
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1  1151 (9th Cir. 2003)("Insofar as the material duties of a position are not at issue, the

2  question of whether these duties ultimately make that position a policymaking . .

3  .position cannot properly be submitted to a jury because it is a question of law.");

4  <u>Gray v. County of Tulare</u>, 32 Cal. App. 4th 1079 (1995) ("The ultimate issue –

5  whether the employee's speech is protected – is a question of law").

6      Even if Hunt could not be considered a member of the executive team subject

7  to termination, Sheriff Carona's conclusion that he was an executive is protected by

8  qualified immunity. <u>See</u>, <u>Nunez v. Davis</u>, 169 F.3d 1222, 1229 (9th Cir. 2000)

9  ("Whether a public official is entitled to qualified immunity is a question of law.")

10  As the Court is aware, the qualified immunity doctrine provides for judicial

11  screening of civil litigation challenging the Constitutionality of peace officers' on-

12  the-job judgment calls. <u>See</u>, <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151

13  (2001)(Discussing the pertinent qualified immunity dismissal standards and

14  sequence of their consideration). Under the doctrine, even where a plaintiff can

15  demonstrate a Constitutional error, qualified immunity analysis requires dismissal

16  whenever a public official's chosen course of conduct was not barred by "clearly

17  established" case law, which was in existence at the time the officer was required to

18  act. <u>Id.</u> at 201; <u>see</u>, <u>Kennedy v. Ridgefield City</u>, 439 F.3d 1055, 1065 (9th Cir. 2006)

19  ("Our task is to determine whether the preexisting law provided the defendants with

20  'fair warning' that their conduct was unlawful.")

21      Moreover, "even if the violated right was clearly established, the [Supreme]

22  Court recognized that it may be difficult for a police officer fully to appreciate how

23  the legal constraints apply to the specific situation he or she faces. Under such a

24  circumstance, '[i]f the officer's mistake as to what the law requires is reasonable, . . .

25  the officer is entitled to the immunity defense.'" <u>Blankenhorn v. City of Orange</u>, 485

26  F.3d 463, 471 (9th Cir. Cal. 2007) (quoting <u>Saucier</u>, 533 U.S. at 205) (alteration in

27  original).

28

- 7 -

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1    As such, "qualified immunity provides a protection to government officials

2    that is quite far reaching." Brewster v. Board of Education, 149 F.3d 971, 977 (9[th]

3    Cir. 1998). It requires dismissal in favor of all police officers "but the plainly

4    incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S.

5    335, 341, 106 S.Ct. 1092 (1986).

6    Here, there was no published decisional law – "clearly established" or

7    otherwise – which told Sheriff Carona he was powerless to respond to a high

8    ranking Lieutenant's attempted insurrection against him. Plaintiff has certainly

9    never cited any authority to the contrary – and it was his burden to do so. See,

10    Collins v. Jordan, 110 F.3d 1363, 1369 (9th Cir. 1996)("The plaintiff bears the

11    burden of showing that the right allegedly violated was clearly established.") [3]

12    As set forth more fully below, and irrespective of the Fazio analysis, Hunt's

13    interest in engaging in the speech in issue is outweighed by the interests of the

14    Sheriff and the Sheriff's Department in an orderly, well disciplined and cohesive

15    work place – a separate justification for demotion. See, Pickering v. Board of

16    Education, 391 U.S. 563, 568, 88 S.Ct. 1731(1968); Eng v. Cooley, 552 F.3d 1062,

17    1072 (9th Cir. 2009)("[T]he Pickering balancing inquiry is ultimately ***a legal***

18    ***question. . ..***")

19    When close working relationships are essential to fulfilling public

20    responsibilities, a wide degree of deference to the employer's judgment is

21    ───────────────────

22    [3] A finding in favor of Defendants under this standard is dispositive of Plaintiff's
lawsuit, and ends the need for further inquiry. See, Fazio v. City & County of San

23    Francisco, 125 F.3d 1328, 1334 (9th Cir. 1997) (Given plaintiff's status as an
employee subject to political discharge, "we do not address [plaintiff's] claim that

24    under the Pickering balancing test his interest in free speech outweighs the
[employer's] interest in running an efficient office."; Plaintiff's discharge for

25    political opposition to the sitting District Attorney affirmed.); see also, Biggs v.
Best, Best & Krieger, 189 F.3d 989, 994-995 (9th Cir. 1999)(Political discharge

26    affirmed with Court finding that this job status alone is "dispositive of any First
Amendment retaliation claim.")

27

28
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1  appropriate. <u>See</u>, <u>Connick v. Myers</u>, 461 U.S 138, 151, 103 S.Ct. 1684 (1983) (In

2  conducting the <u>Pickering</u> balancing, courts must give government employers "wide

3  discretion and control over the management of [their] personnel and internal affairs.

4  This includes the prerogative to remove employees whose conduct hinders efficient

5  operation and to do so with dispatch."); <u>Waters v. Churchill</u>, 511 U.S. 661, 673, 114

6  S.Ct. 1878 (1994)(Public employers need not demonstrate that an employee's

7  expression actually disrupted the workplace; "reasonable predictions of disruption"

8  are sufficient for termination.). These principles are particularly applicable where, as

9  here, a successful candidate for political office is confronted by the losing

10  candidate's bid to retain his position within the organization. <u>See</u>, <u>Jenkins v.

11  Medford</u>, 119 F.3d 1156, 1164-65 (4th Cir. 1997)("We can think of no clearer way

12  for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or

13  potential disloyalty once the candidate takes office, than to actively campaign

14  against the candidate's opponent."); <u>Wilbur v. Mahan</u>, 3 F.3d 214, 218 (7th Cir.

15  1993) ("The declaration of candidacy in these circumstances is a declaration of

16  war."); <u>Upton v. Thompson</u>, 930 F.2d 1209, 1218 (7th Cir. 1991)("[T]he politically

17  active deputy . . ., by vociferously campaigning for the loser, encounters Matthew

18  26:52: 'All they that take the sword shall perish with the sword.'") Again, Sheriff

19  Carona's decisions on this balancing of interests, even if erroneous, are also

20  protected by qualified immunity. <u>See</u>, <u>Brewster v. Board of Educ.</u>, 149 F.3d 971,

21  979-980 (9th Cir. 1998)(Collecting cases).

22     Whether under the threshold <u>Fazio</u> policymaker analysis or the secondary

23  analysis of qualified immunity and <u>Pickering</u>, Defendants are entitled to judgment

24  ***<u>as a matter of law</u>***. And the ultimate decision is ***<u>for the Court</u>*** – not the jury. <u>See</u>,

25  <u>Rankin v. McPherson</u>, 483 U.S. 378, 386, n.9, 107 S. Ct. 2891 (1987)("The ultimate

26  issue -- whether the speech is protected -- is a question of law."); <u>Connick v.

27  Meyers</u>, 461 U.S. 138, 148 n.7, 103 S.Ct. 1684 (1983) ("The inquiry into the

28  - 9 -
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1   protected status of speech is one of law, not fact."); <u>Tortu v. Las Vegas Metro.</u>

2   <u>Police Dep't,</u> 556 F.3d 1075, 1085 (9th Cir. 2009)(Noting that "question[s] of law"

3   are reserved "solely . . . for the [trial court] judge.")

## IV.    PLAINTIFF'S FIRST AMENDMENT - BASED 42 U.S.C. § 1983
##         CLAIM IS BARRED BY THE ELROD - BRANTI RULE

6          Given basic separation of powers principles, the federal Supreme Court has

7   long held that the nation's local government authorities should be accorded "wide

8   discretion and control over the management of [their] personnel and internal

9   affairs." <u>Connick v. Myers</u>, 461 U.S 138, 151, 103 S.Ct. 1684 (1983). Consistent

10  with this principle, the Supreme Court has also found that governmental employees'

11  First Amendment political expression rights must sometimes yield to high level

12  governmental leaders' right to surround themselves with loyal, politically-

13  compatible assistants. <u>See</u>, <u>Branti v. Finkel,</u> 445 U.S. 507, 517, 100 S. Ct. 1287

14  (1980) ("[Political] affiliation may be an acceptable requirement for some types of

15  government employment. Thus, if an employee's private political beliefs would

16  interfere with the discharge of his public duties, his First Amendment rights may be

17  required to yield to the State's vital interest in maintaining governmental

18  effectiveness and efficiency."); <u>Elrod v. Burns,</u> 427 U.S. 347, 367, 96 S. Ct. 2673

19  (1976)(Certain types of governmental employees "may be fired for political reasons

20  without offending the Constitution. . . to the end that representative government not

21  be undercut by tactics obstructing the implementation of policies of the new

22  administration, policies presumably sanctioned by the electorate."); <u>see also</u>, <u>Hall v.</u>

23  <u>Ford</u>, 856 F.2d 255, 263 (D.C. Cir. 1988)("High level officials must be permitted to

24  accomplish their organization objectives through key deputies who are loyal,

25  cooperative, willing to carry out their superiors' policies, and perceived by the

26  public as sharing their superiors aims. . .."); <u>Flynn v. City of Boston</u>, 140 F.3d 42,

27  46 (1st Cir. 1998)("One might ask why anyone, apart from elected officials, should

28

- 10 -

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1  be subject to 'political' firing. The answer . . . is that to implement their mandates,

2  elected officials need a cadre of agency leaders and top subordinates responsive to

3  the elected officials' goals.")

4          "The ultimate inquiry is . . . whether the hiring authority can demonstrate that

5  [political] affiliation is an appropriate requirement for the effective performance of

6  the public office involved." Branti v. Finkel, supra, 100 S. Ct. at 1295; see, O'Hare

7  Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S. Ct. 2353 (1996)(The

8  question is not whether political loyalty is essential or needed but whether it is

9  "reasonably appropriate."); Rutan v. Republican Party of Illinois, 497 U.S. 62, 110

10 S. Ct. 2729, 2739 (1990)("The rule of Elrod and Branti extends to promotion,

11 transfer, recall, and hiring decisions based on party affiliation and support . . ..");

12 Hogan v. City of Syracuse, 2007 U.S. Dist. LEXIS 23675 (N.D.N.Y

13 2007)("Policymakers hold their office at the will of their employer, and may be

14 discharged by reason of political affiliations, political beliefs, ideological viewpoints

15 or partisan activity. . ..")

16         "[P]olice department[s]" are "quasi-military organization[s]" where

17 "[d]iscipline and esprit de corps are vital to [their] functioning. . .." Cochran v. City

18 of Los Angeles, 222 F.3d 1195, 1201 (9th Cir. 2000). Accordingly, even line

19 officers – such as ***Deputy Sheriffs*** – may be subject to political discharge under

20 Elrod-Branti. See, DiRuzza v. County of Tehama, 206 F.3d 1304, 1306 (9th Cir.

21 2000)(Involving a deputy sheriff who was fired for supporting the sheriff's opponent

22 during an election); Gray v. County of Tulare, 32 Cal. App. 4th 1079, 1083

23 (1995)(Upholding discharge of sheriff's captain who made "statements in a local

24 newspaper critical of the sheriff" because the captain was "directly responsible for

25 ***implementing*** the sheriff's directives and ***advising*** him on matters of

26 policy.")(Emphasis added.)

27         The "relevant focus of analysis is the inherent duties of the position in

28                                    - 11 -

question, not the work actually performed by the person who happens to occupy the office." Carroll v. City of Phoenix, 2007 U.S. Dist. LEXIS 28749 (D. Ariz. 2007), citing and quoting, Biggs v. Best, Best & Krieger, 189 F.3d 989, 997 (9th Cir. 1999). Courts take a number of factors into consideration, including whether the officer has "vague or broad responsibilities", "technical competence", "power to control others", "influence on programs" and "contact with elected officials." DiRuzza v. County of Tehama, supra, 206 F.3d at 1310, citing and quoting, Fazio v. City and County of San Francisco, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997).

Here, the forgoing factors strongly support the conclusion "that [political] affiliation [was] an appropriate requirement for the effective performance of the public office" Hunt occupied at the time he began attempting to oust Sheriff Carona. Branti v. Finkel, supra, 100 S. Ct. at 1295.

First, Hunt had vague, broadly- worded job responsibilities as "Police Services Chief for the City of San Clemente."  (Comp., at ¶ 11, ll. 22-23). Orange County's job description for Hunt's high ranking position provides "Examples of Duties," such as:

- "plans, assigns and directs . . . activities ...";
- "*__represents__* the Department in liaison with the press and other media and with community labor and management representatives ...";
- "speaks before civic and other groups";
- "prepares preliminary budget requests";
- "prepares detailed, comprehensive reports";
- "administers inspection programs";
- "instructs command personnel";
- "makes assignments of personnel";
- "*__interprets__* new policies and procedures";
- "recommends changes in operating policies;
- "recommends disciplinary actions."

 (Emphasis added).

In short, and as Plaintiff's own Complaint concedes, Hunt was "responsible for directing the Orange County Sheriff's Department services and day-to-day law enforcement operations within the City of San Clemente and ensured that the applicable policies and procedures of the Sheriff's Department were implemented." (Comp., at ¶ 11, ll. 23-26).

- 12 -

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1   　　　With this type of open-ended authority, the entire San Clemente branch of

2   the Sheriff's Department was subject to Hunt's plenary influence and control. And

3   Hunt has admitted as much in pre-trial proceedings. As a matter of law, common

4   sense and sound political judgment, the successful Sheriff candidate in the 2006

5   election was entitled to have someone he trusted exercising this broad authority –

6   rather than a political enemy, such as Hunt, who had vigorously called for his

7   ouster. See, Upton v. Thompson, 930 F.2d 1209, 1218 (7th Cir. 1991)(Finding peace

8   officer "operate[d] with a sufficient level of autonomy and discretionary authority to

9   justify a sheriff's use of political considerations when determining who will serve [in

10  the position]").

11  　　　Second, the position of Chief of Police requires a high level of technical

12  competence. And Hunt's own self-laudatory political campaign proves the point.

13  For example, Plaintiff stated in on-air remarks to radio personality Cameron Jackson

14  that his service as Chief made him an experienced "leader/manager", who was

15  responsible for the day to day operations of San Clemente's law enforcement

16  agency. Plaintiff announced at that time that Chiefs of Police "are law enforcement

17  executives", " decision makers [that] handle deployment, they handle budgeting,

18  they work with the leaders of the community, they work with the department heads

19  and . . . the city leaders to make sure the we, that those communities are getting the

20  service that they need for law enforcement."

21  　　　Any one of these enumerated job requirements would require a high level of

22  technical competence in areas unique to law enforcement. As Hunt acknowledges,

23  the Chief's position in San Clemente required all of them.

24  　　　Third, as Chief of Police, Hunt had substantial "power to control" others. As

25  part of his management responsibilities, Hunt supervised at least 50 Sheriff's

26  department personnel posted in San Clemente. He set their priorities, their schedules

27  and supervised every aspect of their performance. Thus, Hunt had the ability to

28

- 13 -

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1   advance his own political agenda – and ignore the sitting Sheriff's wishes – in an

2   entire section of Orange County if given the opportunity to do so. See, McBee v.

3   Jim Hogg County, 703 F.2d 834, 839 (5th Cir. 1983), vacated on other grounds, 730

4   F.2d 1009 (5th Cir. 1984) (En banc)(While working, "sheriff's deputies are often

5   called upon to make on-the-spot split-second decisions effectuating the objectives

6   and law enforcement policies which a particular sheriff has chosen to pursue.")

7       Fourth, as the Chief of Police, Hunt had broad "influence on programs".  By

8   his own admission, Plaintiff had the discretion to implement policies in all areas of

9   police services, including strategic budgeting, staffing levels, staff selection, staff

10  assignments, special enforcement team priority deployments, investigative priorities,

11  patrol beat deployment, equipment purchasing, equipment maintenance and special

12  programs development. Hunt was also in charge of San Clemente's law enforcement

13  relationship with the Sheriff's financial service division, fleet maintenance, training,

14  legal counsel, risk management, human resources and internal affairs. He could

15  make adjustments to and/or eliminate Sheriff's programs including traffic

16  enforcement, parking control, crime prevention, School Resource Officers and

17  neighborhood watch. In short, as the top Sheriff's official working on site in San

18  Clemente, Hunt's influence literally extended throughout the Department's

19  operations in the city, as he determined which personnel would be committed to

20  particular projects and what their priorities would be. [4]  See, Flynn v. City of

21  Boston, 140 F.3d 42, 45 (1st Cir. 1998)(Upholding discharge of official whose

22

23

24      [4] Plaintiff's pre-trial efforts to minimize his actual duties as Chief are frankly
        immaterial to the resolution of this case. The important issue, for purposes of
        determining whether a particular ***position*** is one of a policymaker, is the nature of

25      the job itself.  See, Biggs v. Best, Best & Krieger, 189 F.3d 989, 997 (9th Cir. 1999)
        ("Cases clearly hold that the relevant focus of analysis is the ***inherent*** duties of the

26      position in question, not the ***work actually performed*** by the person who happens to
        occupy the office.")(Emphasis added.)

27

28                                   - 14 -

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1   "major responsibilities meant that policy disagreements with his politically

2   appointed supervisor could lead to less effective implementation of political goals.")

3        Fifth, as Chief, Hunt also had "contact with elected officials" – including the

4   San Clemente City Council, the elected Sheriff himself and high ranking City staff

5   such as the City Manager. The Chief's post gave Hunt authority to speak in the

6   name of the Sheriff's Department within the City of San Clemente – and to exercise

7   political influence that could affect the political viability of the Sheriff's

8   administration.  Tellingly, Hunt recognized as much and admittedly used his high

9   ranking post to lobby the San Clemente City Council for political support in his

10  planned campaign against the incumbent Sheriff.

11       Plainly, in the aftermath of the 2006 election, Orange County's elected Sheriff

12  was entitled to have a Chief of Police in San Clemente with whom he felt politically

13  compatible. [5] And after Hunt's vigorous efforts to take his job away, the Sheriff was

14  plainly justified in doubting Plaintiff's future political loyalty. Given Hunt's openly

15  _____

16       [5] Courts have recognized much less authoritative positions as "policymaking"
     within the meaning of Branti and Elrod. See, e.g., Flynn v. City of Boston, 140 F.3d
17   42, 45 (1st Cir. 1998) ("[W]e have upheld political discharges of the regional
     director of an administrative agency, the municipal secretary in a mayor's office, an
18   officer in charge of human resources, a director of public relations, a superintendent
     of public works, a director of a city's federal programs office, and a director of a
19   satellite office of the Massachusetts Secretary of State. Many such plaintiffs were
     subordinates within their own offices."); Fazio v. City & County of San Francisco,
20   125 F.3d 1328 (9th Cir. 1997) (Assistant district attorney running for office against
     his superior); Jenkins v. Medford, 119 F.3d 1156 (4th Cir. 1997) (En banc) (Deputy
21   sheriff); Cutcliffe v. Cochran, 117 F.3d 1353 (11th Cir. 1997) (Deputy sheriff);
     Peters v. Delaware River Port Auth., 16 F.3d 1346 (3d Cir. 1994) (Secretary of
22   transit authority); Selch v. Letts, 5 F.3d 1040 (7th Cir. 1993) (Subdistrict
     superintendent of highway department); Faughender v. City of North Olmsted, 927
23   F.2d 909 (6th Cir. 1991) (Mayor's personal secretary); Green v. Henley, 924 F.2d
     185 (10th Cir. 1991) (Administrator of transportation division of state commission);
24   Bauer v. Bosley, 802 F.2d 1058 (8th Cir. 1986) (Staff legal assistant in court clerk's
     office); Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236 (1st Cir. 1986)
25   (Regional director of urban development and housing corporation); Brown v.
     Trench, 787 F.2d 167 (3d Cir. 1986) (Assistant director of public information);
26   Tomczak v. City of Chicago, 765 F.2d 633 (7th Cir. 1985) (First deputy
     commissioner of water department)

27

28                                    - 15 -
     **ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1    hostile conduct, and the requirements of the San Clemente Chief's position, even the

2    most naive politician would have protected his agenda by removing Hunt from this

3    sensitive command position. [6]

4         As stated by the Ninth Circuit, "[a] public agency would be unmanageable if

5    its head had to . . . retain his political enemies . . . in positions of confidence or

6    positions in which they would be . . . exercising discretion in the implementation of

7    policy." Fazio v. City & County of San Francisco, 125 F.3d 1328, 1333 (9th Cir.

8    1997)(Citations omitted); see, Jenkins v. Medford, 119 F.3d 1156, 1164-65 (4th Cir.

9    1997)("We can think of no clearer way for a deputy to demonstrate opposition to a

10   candidate for sheriff, and thus actual or potential disloyalty once the candidate takes

11   office, than to actively campaign against the candidate's opponent."); Wilbur v.

12   Mahan, 3 F.3d 214, 218 (7th Cir. 1993) ("The declaration of candidacy in these

13   circumstances is a declaration of war."); Upton v. Thompson, 930 F.2d 1209, 1218

14   (7th Cir. 1991)("[T]he politically active deputy . . ., by vociferously campaigning

15   for the loser, encounters Matthew 26:52: 'All they that take the sword shall perish

16   with the sword.'"); see also, Hogan v. City of Syracuse, 2007 U.S. Dist. LEXIS

17   23675 (N.D.N.Y 2007)("Primary election fights can be famously brutal, sometimes

18   more so than contests in the general election, and animosity between candidates and

19   their supporters is likely to result.")

20        If termination was constitutionally permissible under Elrod-Branti – and it

21   *was* – Hunt has no conceivable claim here, where his grievance is that he did not

22   receive the post-election position of his choice. See, Rutan v. Republican Party of

23   Illinois, 497 U.S. 62, 110 S. Ct. 2729, 2739 (1990)("The rule of Elrod and Branti

24   _____

25        [6] Plaintiff's criticisms of the Sheriff and the Department in the "blueprint" issued
     by his campaign describes Hunt's many disagreements with the incumbent Sheriff,
26   the management of the Department, and the steps Hunt claimed he would have to
     "restore integrity and trust to the Sheriff's Department."

27

28                                    - 16 -

1   extends to promotion, transfer, recall, and hiring decisions based on party affiliation

2   and support . . ."); Hobler v. Brueher, 325 F.3d 1145, 1150 (9th Cir. 2003)("[A]n

3   employee's status as a policymaking or confidential employee would be dispositive

4   of **_any_** First Amendment retaliation claim.")(Emphasis added.)  Accordingly, all of

5   Hunt's claims should be dismissed **_as a matter of law._**

6   **V.     HUNT'S FIRST AMENDMENT - BASED 42 U.S.C. § 1983 CLAIMS**

7   **AGAINST DEFENDANTS ARE BARRED BY THE PICKERING**

8   **BALANCING TEST**

9          If the Court determines that Hunt's position falls outside Elrod –Branti [7],

10  Plaintiff's next hurdle is to demonstrate that his attacks on the sitting Sheriff are

11  entitled to Constitutional protection. See, Pickering v. Board of Education, 391 U.S.

12  563, 568, 88 S.Ct. 1731(1968). This, in turn, requires the Court to make two

13  findings: "(1) that [Hunt's] speech involved a matter of public concern, and (2) that

14  the interests served by allowing [Hunt] to express [himself] outweighed [the

15  incumbent Sheriff's] interest in promoting workplace efficiency and avoiding

16  workplace disruption." Keyser v. Sacramento Unified School Dist., 265 F. 3d 741,

17  743 (9th Cir. 2001). As with other aspects of this First Amendment case, the issue is

18  for the Court – not the jury. See, Rankin v. McPherson, 483 U.S. 378, 386, n.9, 107

19  _____

20         [7] As noted above, a determination that an employee is a "policymaker" requires
       affirmance of the employee's re-assignment/dismissal -- without any further
21     analysis under Pickering.  See, Hobler v. Brueher, 325 F.3d 1145, 1150 (9th Cir.
       2003)("[W]e only consider whether Pickering protects the employee's speech,
22     activities, affiliations or beliefs in cases where the employee is not in a
       policymaking or confidential position."); Fazio v. City & County of San Francisco,
23     125 F.3d 1328, 1334 (9th Cir. 1997) (Given  plaintiff's status as a policymaker, "we
       do not address [plaintiff's] claim that under the Pickering balancing test his interest
24     in free speech outweighs the [employer's] interest in running an efficient office.";
       Plaintiff's discharge for political opposition to the sitting District Attorney
25     affirmed.); Biggs v. Best, Best & Krieger, 189 F.3d 989, 994-995 (9th Cir.
       1999)(Subordinate governmental attorney discharge affirmed with Court finding
26     that this job status alone is "dispositive of any First Amendment retaliation claim.";
       No Pickering analysis).

27

28                                        - 17 -

1  S. Ct. 2891 (1987)("The ultimate issue -- whether the speech is protected -- is a
2  question of law.")

3       Here, Hunt's position fails, <u>inter alia</u>, on the second <u>Pickering</u> factor. By his
4  own admission, Hunt leveled a series of heated attacks on the sitting Sheriff prior to
5  his transfer – questioning the incumbent's competence, integrity and priorities. The
6  Sheriff's Department thereafter fractured into antagonistic factions and the resulting
7  infighting carried the potential to disrupt the Department's ability to effectively
8  function into the indefinite future. Orange County needed unified, focused law
9  enforcement. <u>See</u>, <u>Menotti v. City of Seattle</u>, 409 F.3d 1113, 1131 (9th Cir.
10 2005)(Observing that law enforcement "is a ***<u>core duty</u>*** that the government ***<u>owes its</u>***
11 ***<u>citizens</u>***. . . ..")(Emphasis added.). Whatever public interest was served by Hunt's
12 attacks, it simply does not outweigh the disruption they helped engendered in one of
13 this country's largest law enforcement agencies.

14      Indeed, appellate courts have often instructed trial courts to take actual and
15 potential office disruption into consideration when weighing <u>Pickering</u> issues. <u>See</u>,
16 <u>Brewster v. Unified School Dist.</u>, 149 F.3d 971, 979 (9th Cir. 1998)(Collecting
17 cases<u>); see also, Connick v. Myers</u>, 461 U.S 138, 151, 103 S.Ct. 1684 (1983) (In
18 conducting the <u>Pickering</u> balancing, courts must give government employers "wide
19 discretion and control over the management of [their] personnel and internal affairs.
20 This includes the prerogative to remove employees whose conduct hinders efficient
21 operation and to do so with dispatch."); <u>Waters v. Churchill</u>, 511 U.S. 661, 673, 114
22 S.Ct. 1878 (1994)(Public employers need not demonstrate that an employee's
23 expression actually disrupted the workplace; "reasonable predictions of disruption"
24 are sufficient for termination.).

25      Put simply, no one in this case was required to engage in "reasonable
26 predictions" of disruption in order to properly assess the propriety of Hunt's re-
27 assignment in this case. Hunt himself admits that the campaign tore the Sheriff's
28

- 18 -
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1  Department apart.

2      In short, Hunt's situation represents the exact type of fact-pattern where

3  federal courts leave the details of governmental management to the successful

4  candidates for political office – and the electoral majority which gave the candidate

5  their support. See, Connick v. Myers, 461 U.S 138, 151, 103 S.Ct. 1684

6  (1983)(Federal courts are to accord governmental supervisors "wide discretion and

7  control over the management of [their] personnel and internal affairs."); Hall v.

8  Ford, 856 F.2d 255, 263 (D.C. Cir. 1988)("High level officials, must be permitted to

9  accomplish their organization objectives through key deputies who are loyal,

10  cooperative, willing to carry out their superiors' policies, and perceived by the

11  public as sharing their superiors aims. . ..")

12  **V.    DEFENDANT CORONA IS SHIELDED BY QUALIFIED IMMUNITY**

13      Significantly, even if Hunt were to prevail on the Elrod -Branti and Pickering

14  balancing tests -- and he ***should not*** -- Plaintiff's First Amendment-related claims

15  would still be barred under the qualified immunity doctrine. This too is a question of

16  law for the Court. See, Nunez v. Davis, 169 F.3d 1222, 1229 (9th Cir. 2000)

17  ("Whether a public official is entitled to qualified immunity is a question of law.")

18      The Supreme Court has recognized that civil suits against government

19  officials concerning the meaning and scope of Constitutional rights, such as the First

20  Amendment rights at issue here, entail substantial "social costs" which include the

21  "expense of litigation, the diversion of official energy from pressing public issues

22  and the deterrence of able citizens from acceptance of public office."  Harlow v.

23  Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727 (1982).  The Supreme Court has also

24  recognized that "[o]fficials can act without fear of harassing litigation only if they

25  reasonably can anticipate when their conduct may give rise to liability for

26  damages...."  Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012 (1984) The

27  qualified immunity doctrine addresses these concerns by providing that:

28
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1
2
3

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate ***clearly established*** . . . constitutional rights of which a reasonable person would have known.

4    Harlow v. Fitzgerald, supra, 457 U.S. at 818 (Emphasis added.) [8]

5    Qualified immunity "is simply the adaptation of the fair warning standard to

6    give officials . . . the same protection from civil liability and its consequences that

7    individuals have traditionally possessed in the face of vague criminal statutes."

8    United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 1227 (1997).  Both doctrines

9    bar enforcement of  "a [law] which either forbids or requires the doing of an act in

10   terms so vague that men of common intelligence must necessarily guess at its

11   meaning and differ as to its application."  Id. at 1225. That is, "[t]he contours of the

12   right must be sufficiently clear that a reasonable official would understand that what

13   he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.

14   Ct. 3034 (1987). If the controlling law is not "clearly established", an official cannot

15   be liable, because "a reasonable person would not be expected to know how to

16   structure his conduct to avoid liability." Mendoza v. Block, 27 F.3d 1357, 1361 (9th

17   Cir. 1994); see, Quon v. Arch Wireless Operating Co., 2006 U.S. Dist. Lexis 61612

18   (C.D. Cal. 2006) (Under qualified immunity, "officials will not stand trial 'for 'bad

19   guesses in gray areas' but only for 'transgressing bright lines.").  [9]

20   _____

21   [8] Another important public policy rationale for qualified immunity is that the
     threat of litigation concerning hazy, grey areas of Constitutional law would
22   doubtlessly produce unacceptable tentativeness in law enforcement and "officials
     should not err always on the side of caution because they fear being sued."  Hunter
23   v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534 (1991)(Citation omitted).
        [9] Further, "[p]ublic officials are not obligated to be creative or imaginative in
24   drawing analogies from previously decided cases." Adams v. St. Lucie County
     Sheriff's Dept, 962 F.2d 1563, 1575 (11th Cir. 1992). Thus, courts have emphasized
25   that "judges should not expect police officers to read United States Reports in their
     spare time, to study arcane constitutional law treatises, or to analyze [Constitutional]
26   developments with a law professor's precision.  We do not expect police officers to
     do those things." Ganwich v. Knapp, 319 F.3d 1115, 1125 (9th Cir. 2003).

27

28                                        - 20 -
                    **ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1    Further, the right asserted must be "clearly established at the time of the

2   challenged actions." Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806 (1985);

3   see, Wilson v. Layne, 526 U.S. 603, 618, 342 S. Ct. 821 (1999)("If judges thus

4   disagree on a constitutional question, it is unfair to subject [public employees] to

5   money damages for picking the losing side of the controversy.")

6    "The plaintiff bears the burden of showing that the right allegedly violated

7   was clearly established." Collins v. Jordan, 110 F.3d 1363, 1369 (9th Cir. 1996);

8   see, Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987)(The plaintiff

9   must make a "particularized showing" that a "reasonable official would understand

10  that what he is doing violated that right" or that "in the light of preexisting law the

11  unlawfulness" of the action was "apparent." ). Hunt has not, and cannot, satisfy this

12  burden here.

13    Hunt has never cited any controlling case from any jurisdiction which would

14  have clearly put the Sheriff on notice that Plaintiff fell outside the Elrod - Branti rule

15  permitting office personnel transfers. Nor is there one.

16    To the contrary, courts have repeatedly found that, "the Branti guidelines do

17  not lend themselves to easy or automatic application." Hawkins v. Steingut, 829

18  F.2d 317, 320 (2d Cir.1987); see,  Jimenez Fuentes v. Torres Gaztambide, 807 F.2d

19  236, 241 (1st Cir.1986) (En banc) ("Identifying generic categories of positions

20  where partisan selection and rejection are permissible has … proven to be an elusive

21  and intractable task."); Flynn v. City of Boston, 140 F.3d 42, 45 (1st Cir.

22  1998)("[T]he lower federal courts have tried to develop doctrine" for assessing the

23  Constitutionality of political dismissals, "but it is largely a porridge of general

24  statements and variables. . ..")

25    For this reason, federal courts have not hesitated to invoke qualified immunity

26  when assessing the propriety of a public official's decision regarding the

27  applicability of Elrod-Branti principles to a given employment position. See, e.g.,

28

- 21 -
**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1   <u>Billingsley v. St. Louis County,</u> 70 F.3d 61, 64 (8th Cir. 1995)("It is clear, then, that

2   under [existing precedent] a government worker who performs technical, ministerial

3   tasks cannot be discharged based on his political beliefs. [Precedent also]

4   established that a government worker who is in a confidential position can be

5   dismissed on account of his political affiliation. Between these two polar positions,

6   however, a broad range of positions exists for which there are no clear guidelines.

7   Accordingly, we cannot say that defendants should have known they were violating

8   a clearly established right."); <u>Mirch v. City of Troy,</u> 2002 U.S. Dist. LEXIS 6467,

9   11-12 (N. D. N. Y. 2002) ("While the First Amendment rights of speech and

10   association are firmly established in many contexts, even a cursory review of the

11   'policymaker' exception' as articulated in <u>Elrod - Branti</u> and their progeny, reveals

12   that the contours of First Amendment protections in the context presented by the

13   instant case are considerably less clear. . ..[T] he Court finds that it was objectively

14   reasonable for Defendant[s] . . .to view Plaintiff as a 'policymaker.' Thus,

15   Defendants' decision to terminate Plaintiff for political reasons cannot be considered

16   a violation of a 'clearly established' right.").

17         As stated by another federal District Court:
            Even assuming that there are factual issues concerning

18             [plaintiff's] status as a policymaker, reasonable officials
            could disagree over his status. As the Second Circuit

19             stated: 'While <u>Elrod</u> and <u>Branti</u> developed a useful
            framework for assessing the constitutionality of patronage

20             dismissals, it cannot be said that these decisions clearly
            established the law with respect to every governmental

21             position. Following <u>Branti</u>, the courts have proceeded on a
            case by case basis to enumerate the permissible and

22             impermissible instances of politically motivated
            employment decisions; however, the <u>Branti</u> guidelines do

23             not lend themselves to easy or automatic application.'
            [Citation omitted.] Lacking an 'easy or automatic

24             application,' I find that even if [plaintiff] was protected
            from political termination by the First . . . Amendment, the

25             law is sufficiently unclear so that reasonable
            disagreements could exist over [plaintiff's] constitutional

26             rights. Defendants, in their individual capacity, are
            [therefore] protected by qualified immunity.

27   <u>McDermott v. Pataki</u>, 1996 U.S. Dist. LEXIS 15338, 15-16 (N.D.N.Y. 1996)

28                             - 22 -

Wholly apart from Elrod-Branti issues, Hunt has never cited any controlling case law which would have put Defendants on clear notice that the Pickering balancing test plainly weighs in Plaintiff's favor in the circumstances of this case. And, once again, there is no such authority. Indeed, federal courts have repeatedly held that because the resolution of employment issues under Pickering is so fact specific, and requires the sensitive balancing of so many competing factors, a public official required to weigh them in making employment decisions is almost always protected by qualified immunity. As stated by the Ninth Circuit:

> This court has observed that the Pickering test 'requires particularized balancing on the unique facts presented in each case,' Voigt v. Savell, 70 F.3d 1552, 1560-61 (9th Cir. 1995), and the Supreme Court has specifically stated that the Pickering balance is a 'difficult' one to strike, see, Connick, 461 U.S. at 150. Because, under Pickering, the determination whether an employee's expression is constitutionally protected requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will 'rarely, if ever, be sufficiently clearly established to preclude qualified immunity . . ..' [Citations omitted]

Brewster v. Board of Educ., 149 F.3d 971, 979-980 (9th Cir. 1998)

Simply put, the considerations thought controlling in Brewster also govern the appropriate resolution of this case. See, Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986) (Qualified immunity precludes the imposition of liability for "all but the plainly incompetent or those who knowingly violate the law.").

What is "plainly incompetent" about an elected official seeking to heal the post-election divisions in his Department by demoting the self-proclaimed leader of his political opposition? How can an elected official be said to "knowingly violate the law" by demoting his vocal political opponent when the Supreme Court has pointedly advised America's public officials that they have "the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." Connick v. Myers, 461 U.S 138, 151, 103 S.Ct. 1684 (1983). As Plaintiff has no convincing or coherent answers to either of these questions, the Court should

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**

1   grant qualified immunity as prayed.

2   **VI.    PLAINTIFF WAS PREVENTED BY THE HATCH ACT FROM**
3   **RUNNING FOR ELECTIVE OFFICE**

4          5 U. S. C. § 1502(a)(3), a portion of the federal statute commonly known as
5   the Hatch Act, provides, in pertinent part, that certain state or local public officers or
6   employees may not be a candidate for public office.  5 U.S.C. § 1501 defines a state
7   or local officer or employee as "an individual employed by a State or local agency
8   whose principal employment is in connection with an activity which is financed in
9   whole or in part by loans or grants made by the United States or Federal agency."

10         In his position as Chief of Police services, Plaintiff was directly involved with
11  seeking, receiving and applying loans and/or grants made by the United States or a
12  Federal agency.  Therefore, Hunt was not only not privileged under controlling
13  federal law to be a candidate for the public office of Sheriff for the County of
14  Orange, he was specifically proscribed from doing so. See, Bigelow v. RKO Radio
15  Pictures, Inc., 327 U.S. 251, 264, 66 S. Ct. 574 (1946) (The justice system should
16  not "enable the wrongdoer to profit by his wrongdoing"); Dart Industries, Inc. v.
17  Liberty Mut. Ins. Co., 484 F.2d 1295, 1298 (9th Cir. 1973) ("[T]he wrongdoer as a
18  matter of public policy should not profit from his own wrong."); see also, Susag v.
19  City of Lake Forest, 94 Cal. App. 4th 1401, 1412 (2002) ("[C]ourts will not assist
20  the participant in an illegal act who seeks to profit from the act's commission.").

21  **VII.  CONCLUSION**

22         This case raises important Constitutional principle**s** – both for the Defendants
23  in this case, and for future elected officials faced with a public insurrection  among
24  those they promoted and whose careers they nurtured. As a matter of law and
25  common sense, Plaintiff Hunt's heated attacks on his superior merited a forceful
26  response. Hunt cannot profess genuine surprise at this development, and he certainly
27  cannot properly seek to profit from his own rebellion through the rubric of this

28
                                     - 24 -

1   lawsuit. <u>See</u>, <u>Jenkins v. Medford</u>, 119 F.3d 1156, 1165 (4th Cir. 1997)("In

2   jurisdictions where the sheriff is elected by popular vote, the triumph of one

3   candidate indicates voter approval of the candidate's espoused platform and general

4   agreement with the candidate's 'expressed political agenda.' Some candidates gain

5   office by promising changes in current policy. By choosing a particular candidate to

6   protect the citizens of the county, the electorate vests in the sheriff broad discretion

7   to set and implement the policies necessary to carry out his goals. The sheriff owes a

8   duty to the electorate and the public at large to ensure that his espoused policies are

9   implemented."); <u>Flynn v. City of Boston</u>, 140 F.3d 42, 46 (1st Cir. 1998)("[I]f the

10   allegations of the complaint are true, . . .[plaintiffs] were public servants honestly

11   resisting very dubious behavior by a superior. But the main remedy for

12   mismanagement is elections. And officials who rise to the level of [plaintiffs] do so

13   at the cost of any constitutional tenure protection against political discharge -- unless

14   and until the Supreme Court takes a different view . . ..")

15   DATED:  October 1, 2009        **LYNBERG & WATKINS**
A Professional Corporation

16

17                                By: _____/S/_____

18                                      **NORMAN J. WATKINS**
**S. FRANK HARRELL**
**SHANNON L. GUSTAFSON**

19                                      Attorneys for Defendants, COUNTY OF ORANGE and MICHAEL S. CARONA

20

21

22

23

24

25

26

27

28

**ORANGE COUNTY DEFENDANTS' TRIAL BRIEF**