1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WILLIAM J. HUNT,

              Plaintiff,

      vs.

MICHAEL S. CARONA,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 07-00705 MMM (MLGx)

ORDER ENTERING JUDGMENT FOR
DEFENDANT AS A MATTER OF LAW

Plaintiff William J. Hunt commenced this action against the County of Orange, Michael S. Carona, and certain fictitious defendants in June 2007.[1]  On October 2, 2007, Judge Andrew Guilford granted in part and denied in part defendants' motion to dismiss Hunt's complaint.[2] Judge Guilford declined to dismiss Hunt's claims under 42 U.S.C. § 1983 and the Public Safety

[1]Complaint, Docket No. 1 (June 18, 2007).

[2]Order Denying in Part and Granting in Part Defendants County of Orange and Michael S. Carona's Motion to Dismiss Plaintiff's Entire Action, Docket No. 21 (Oct. 2, 2007).

Officers Procedural Bill of Rights Act ("POBRA"), California Government Code §§ 3300 et seq. On September 18, 2009, following a transfer of the action to this court, the court determined that resolution of plaintiff's remaining POBRA claim would require decision of a novel and complex issue of state law. It therefore dismissed the claim under 28 U.S.C. § 1367(a).[3]

On August 20, 2009, the court denied defendants' motion for summary judgment, concluding that triable issues of fact remained regarding Hunt's duties as a lieutenant and chief police services in the Orange County Sheriff's Department.[4] The nature of Hunt's job responsibilities was relevant in assessing whether political loyalty was a requirement for effective performance of the public office he held, and thus whether defendant Carona was justified in demoting Hunt following Hunt's campaign for Sheriff-Coroner against Carona.

Hunt announced his candidacy for the office of Sheriff-Coroner for the County of Orange in May 2005, challenging Carona, the incumbent Sheriff. Between May 2005 and June 2006, Hunt made public statements, gave radio addresses, issued press releases, and disseminated campaign literature (in print and via the Internet) critical of Carona's performance as sheriff. The day after Carona won reelection, he placed Hunt on administrative leave pending a personnel investigation regarding his speech and conduct during the campaign. On October 31, 2006, Hunt was served with a Notice of Pending Demotion, which stated that Carona proposed to demote him three ranks (from Lieutenant to Deputy Sheriff II) based on the content of his campaign communications. Following a pre-disciplinary hearing, Hunt received a Notice of Demotion on December 22, 2006.

On October 13, 2009, a jury trial commenced on Hunt's § 1983 claim against Carona. At that trial, the parties presented evidence regarding the nature of Hunt's job responsibilities and position within the Orange County Sheriff's Department ("OCSD"). Hunt portrayed his role as a limited, circumscribed one, while Carona argued that he was a member of the Sheriff

---

[3]Order Dismissing Plaintiff's Fourth Cause of Action, Docket No. 121 (Sept. 18, 2009).

[4]Order Denying Defendants' Motion for Summary Judgment ("Summary Judgment Order"), Docket No. 85 (Aug. 20, 2009) at 12-22.

1    Department's executive management team with broad responsibilities.

2          On October 21, 2009, both parties rested and the court instructed the jury to answer 37

3    special interrogatories concerning Hunt's job responsibilities to assist it in determining whether

4    political loyalty was an appropriate requirement of Hunt's position as a lieutenant and chief of

5    police services.[5]  After the jury returned answers to the questions, and the court heard argument

6    on the issue, on October 22, 2009, the court ruled that political loyalty was an appropriate

7    requirement for Hunt's position, and alternatively, that even if it was not, Carona was entitled to

8    qualified immunity for reaching a contrary conclusion.  This order supplements and explains the

9    court's oral ruling.

10         **A.    The *Elrod-Branti* Exception**

11         "Policymaker status is a question of law for the court, but the inquiry is fact intensive.

12   Bearing that in mind, at the conclusion of trial, [the court] presented the jury with . . . special

13   interrogator[ies] so that the members of the jury, whose job it is to determine the facts of the case,

14   could provide factual guidance to the Court in our determination of this legal question." *Cicchetti*

15   *v. Davis*, 607 F.Supp.2d 575, 579 (S.D.N.Y. 2009).  The court asked the jury to make specific

16   factual findings with respect to each factor identified as relevant by the Ninth Circuit; the only

17   exception was whether Hunt had special training or expertise relevant to his position, as it was

18   undisputed that he had technical competence respecting California's POST requirements.[6]  See *id.*

19

20   _____

21         [5]Prior to submitting these questions to the jury, on October 20, 2009, the court denied
     Carona's motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil
22   Procedure.  This motion was based in part on an argument that political loyalty was an appropriate
     requirement of Hunt's job and alternatively, on the fact that Carona could mistakenly have
23   believed that it was a requirement, such that he was entitled to qualified immunity.  The court
     denied the motion, noting that the same factual disputes that had precluded resolution of the issue
24   on summary judgment remained at the close of the evidence, and that the court would not be able
     to resolve the question until the jury had provided answers to the special interrogatories that had
25   been propounded regarding Hunt's job responsibilities.

26

27         [6]POST is an acronym for the California Commission on Peace Officers' Standards and
     Training, which certifies law enforcement officers at different levels based on their number of
28   years of service and their experience.  (RT at 74:19-25.)

("We asked the jury for findings as to each [*Elrod-Branti*] factor that we had been unable to determine before the trial, with the exception of whether plaintiff had any special training or expertise relevant to his position as Fire Commissioner, as it was evident from the trial, and apparently undisputed, that plaintiff had none"). [7]

_____

[7] The court requested at the final pretrial conference that the parties provide a joint proposed set of interrogatories. On September 28, 2009, plaintiff and defendant separately submitted proposed interrogatories. Defendant submitted twenty-one proposed interrogatories that addressed only the *Elrod-Branti* inquiry. (Defendants' Proposed Special Interrogatories to the Jury, Docket No. 137 (Sept. 28, 2009).) Plaintiff proposed ten interrogatories that, like defendant's questions, addressed only *Elrod-Branti*. (Plaintiff's Proposed Special Interrogatories to the Jury, Docket No. 140 (Sept. 28, 2009).) The interrogatories proposed did not address factual questions relevant to the *Pickering* balancing test nor to qualified immunity. Additionally, the *Elrod-Branti* questions proposed were framed primarily as legal questions rather than as fact-specific inquiries regarding plaintiff's duties as Lieutenant and Chief of Police Services for the City of San Clemente. Consequently, the court asked the parties to submit proposed interrogatories on the *Pickering* balancing test and qualified immunity, and to resubmit their *Elrod-Branti* interrogatories, focusing in on factual questions regarding Hunt's duties. In response to this request, defendant resubmitted the same interrogatories regarding *Elrod-Branti* that he had previously proffered. Plaintiff, by contrast, submitted four interrogatories that focused even less on factual inquiries regarding Hunt's duties than his first set had, and more on the legal standards. (Plaintiff's Proposed Special Interrogatories to the Jury on *Elrod/Branti* Policy Making Doctrine, Docket No. 186 (Oct. 29, 2009).) Plaintiff submitted two proposed interrogatories regarding the *Pickering* balancing test, which asked whether plaintiff's speech was "about wastefulness, mismanagement, unethical conduct, [or] violations of regulations or incompetence" and whether it caused an "actual, substantial, and material disruption" in the workplace. (Plaintiff's Proposed Special Interrogatories to the Jury on *Pickering* Balancing Test, Docket No. 187 (Oct. 29, 2009).) Defendant proposed twenty-two interrogatories relevant to the *Pickering* balancing test; each addressed only whether Hunt had made certain statements, not whether the statements had caused any disruption. (Defendants' Proposed Revised Special Interrogatories to the Jury re: *Pickering* Decision, Docket No. 179 (Oct. 15, 2009).)

Given the state of the proposed interrogatories, the court set a hearing for Monday, October 19, 2009, at which it presented its own set of proposed interrogatories on *Elrod-Branti*, *Pickering*, and qualified immunity; the court's proposed interrogatories incorporated, as appropriate, questions that had been submitted by the parties. The parties and the court considered the court's proposed interrogatories for three hours, and the court gave the parties an opportunity to make objections and comments. It provided a revised set of interrogatories to the parties on the morning of October 20, 2009, incorporating the comments and objections made at the October 19, 2009 hearing. After taking further comments and objections, the court prepared and gave counsel a revised set of interrogatories at the end of the day on October 20, 2009. The special interrogatories were not finalized until the morning of October 21, 2009, just prior to

In *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court evaluated the constitutionality of patronage dismissals, i.e., situations in which public employees are discharged or threatened with discharge solely because of their partisan affiliation (or lack thereof). Writing for a plurality, Justice Brennan held that such dismissals violated the Constitution, because "[p]atronage, . . . to the extent it compels or restrains belief and association[,] is inimical to the process which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.'" *Elrod*, 427 U.S. at 357 (citation omitted). The *Elrod* Court nonetheless noted a narrow exception to the general bar against patronage dismissals. Justice Brennan explained:

> "A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate. . . . Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end." *Elrod*, 427 U.S. at 367.

Conceding that "[n]o clear line c[ould] be drawn between policymaking and nonpolicymaking positions," Justice Brennan emphasized that "[t]he nature of the responsibilities [was] critical" in ascertaining whether or not a particular employee held a policymaking position that fell within the exception. *Id.*[8]

---

instructing the jury; that morning, the court heard additional comments on the interrogatories. In total the interrogatories were the product of more than six hours of hearings.

[8]Justice Brennan elaborated: "While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration would also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus, the political loyalty 'justification is a matter of proof, or at least argument, directed at particular kinds of jobs.' . . . Since, as we have noted, it is the government's burden to demonstrate an overriding

In *Branti v. Finkel*, 445 U.S. 507 (1980), the Supreme Court reaffirmed the general principle that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti*, 445 U.S. at 517 (citing *Elrod*). The "ultimate inquiry," the Court stated, "is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518. Since *Branti*, circuit courts have clarified that "political affiliation" is broader than "party membership," extending to "commonality of political purpose and support." See, e.g., *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 996 (9th Cir. 1999) (citations omitted); see also *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001) (citing, *inter alia*, *Biggs*).

The Supreme Court revisited the *Elrod-Branti* doctrine again in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990). Noting it had "acknowledged [in *Elrod*] that a government has a significant interest in ensuring that it has effective and efficient employees," *id.* at 69 (citing *Elrod*, 427 U.S. at 372-73), the Court stated that "a government can meet its need for politically loyal employees to implement its policies by the less intrusive measure of dismissing, on political grounds, only those employees in policymaking positions," *id.* at 70. *Rutan* addressed whether the *Elrod-Branti* doctrine applies to employment action against an employee short of dismissal. The Court held that "[e]mployees who do not compromise their beliefs stand to lose the considerable increases in pay and job satisfaction attendant to promotions, the hours and maintenance expenses that are consumed by long daily commutes, and even their jobs if they are not rehired after a 'temporary' layoff. These are significant penalties and are imposed for the exercise of rights guaranteed by the First Amendment. Unless these patronage practices are narrowly tailored to further vital government interests, we must conclude that they impermissibly

---

interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent." *Elrod*, 427 U.S. at 367-68 (citation omitted).

1    encroach on First Amendment freedoms." *Id.* at 74.

2            **1.**      **The Ninth Circuit's Balancing Test**

3           The Ninth Circuit has directed that courts consider nine factors in determining whether

4    political loyalty is an appropriate requirement for the effective performance of a public office.

5    These include whether the employee has "vague or broad responsibilities, [his] relative pay,

6    technical competence, power to control others, authority to speak in the name of policymakers,

7    public perception, influence on programs, contact with elected officials, and responsiveness to

8    partisan politics and political leaders." *Fazio v. City and County of San Francisco*, 125 F.3d

9    1328, 1334 n. 5 (9th Cir. 1997) (citing *Hall v. Ford*, 856 F.2d 255, 262 (D.C. Cir. 1988).[9]  A

10   similar test is utilized in the D.C. Circuit, *Hall*, 856 F.2d at 262 ("Among the relevant indicia of

11   policymaking authority are vague or broad responsibilities, relative pay, technical competence,

12   power to control others, authority to speak in the name of policymakers, public perception,

13   influence on programs, contact with elected officials, and responsiveness to partisan politics and

14

_____

15       [9]The *Fazio* court held that a San Francisco assistant district attorney "had no First

16   Amendment right to run for office against his or her superior without being subject to termination

17   for that reason." *Fazio*, 125 F.3d at 1334.  In so concluding, the Ninth Circuit relied on Fazio's

18   pay, the fact that he commented to the media about cases of general public interest, and the fact
     that he handled high profile cases with a great degree of autonomy.  *Id.*  In a footnote at the end

19   of the opinion, the Ninth Circuit adopted the factors articulated by the D.C. Circuit in *Hall* as
     suitable criteria to use in assessing whether political loyalty is an appropriate requirement for the

20   effective performance of a public office.  *Id.* at 1334 n. 5.  The D.C. Circuit, in turn, appears to
     have drawn the factors from the First Circuit's decision in *Jimenez Fuentes v. Torres Gaztambide*,

21   807 F.2d 236 (1st Cir. 1986) (en banc).  *Hall*, 856 F.2d at 262 (quoting *Jimenez Fuentes*, 807

22   F.2d at 242).  The factors appear to have had their genesis in an opinion by Judge Weinstein of
     the Eastern District of New York, cited in *Jimenez Fuentes*, which stated:

23           "Whether any particular non-elective position in government serves this function
             of responding relatively directly to the voters requires some practical sense for the

24           political-governmental system in operation.  Among the indicia that locate a job
             along the spectrum between policymaker and clerk are: relative pay, technical

25           competence, power to control others, authority to speak in the name of
             policymakers, public perception, influence on programs, contact with elected

26           officials and responsiveness to partisan politics and political leaders.  In all these

27           respects, plaintiff was a politician making policy in a political job."  *Ecker v.*
             *Cohalan*, 542 F.Supp. 896, 901 (E.D.N.Y. 1982).

28

political leaders"); the First Circuit, *Jimenez Fuentes*, 807 F.2d at 242 (quoting *Ecker*, 542 F.Supp. at 901); and the Second Circuit, *Gordon v. County of Rockland*, 110 F.3d 886, 889-90 (2d Cir. 1997) ("These factors include whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders").

The Third Circuit employs a slight variant of this test. *Galli v. New Jersey Meadowlands Commission*, 490 F.3d 265, 271 (3d Cir. 2007) ("These factors include whether the employee has duties that are non-discretionary or non-technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire and fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers. . . . The 'key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility[,] but whether [she] has meaningful input into decisionmaking concerning the nature and scope of a major [ ] program,'" quoting *Armour v. County of Beaver, Pennsylvania*, 271 F.3d 417, 429 (3d Cir. 2001)).[10]

---

[10]In other circuits, the inquiry is substantially different. The Sixth Circuit, for instance, asks whether a position fits into one of four narrowly defined categories. *Heggen v. Lee*, 284 F.3d 675, 681 (6th Cir. 2002) ("1. positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted; 2. positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions; 3. confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors; and 4. positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies"). Other courts merely ask whether the position relates to partisan political interests, *Jenkins v. Medford*, 119 F.3d 1156, 1162 (4th Cir. 1997) ("The court must first determine whether the position held by the dismissed employee relates to partisan political

### a.    Vague or Broad Responsibilities

As the Supreme Court noted in *Elrod*, "[n]o clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical." *Elrod*, 427 U.S. at 367-68. See also *Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 132 (1st Cir. 2005) ("Job descriptions that are broad or open ended – given the employee's latitude to exercise discretionary judgment – generally indicate a policymaking position, while job descriptions that are narrowly circumscribed inhibit freedom of action and generally indicate a non-policymaking position"); *Tomalis v. Office of Attorney General of Commonwealth of Pennsylvania*, 45 Fed.Appx. 139, 143 (3d Cir. June 3, 2002) (Unpub. Disp.) ("After reviewing the duties that Tomalis actually performed, and the duties he could be called on to perform as a Senior Attorney . . . , there is no doubt that the District Court disposed of this issue correctly. The [job] description is quite broad and includes the potential for rendering legal services, giving advice, and otherwise engaging in roles that would have a substantial impact on politically sensitive issues").

The jury found that Hunt's job responsibilities were "restricted to implementing the Department's goals within a general framework provided by the Department,"[11] and "restricted to implementing the City of San Clemente's goals within a general framework provided by the

_____

interests. If the position does relate to those interests, the court must then examine the particular responsibilities of the position. When the position at issue resembles a policymaker, a communicator, or a privy to confidential information, political party affiliation can be an appropriate requirement for effective job performance"), or whether the position involves input into decisionmaking, *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 355 (7th Cir. 2005) ("The test for whether a position involves policymaking is 'whether the position authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation,'" quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)).

[11]Interrogatory No. 25.

9

Department."[12]  The jury also found that Hunt "formulate[d] plans to implement the broad goals
of the OCSD in the City of San Clemente."[13]  Reading these responses in combination, the jury
found that Hunt formulated plans to implement the broad goals of the OCSD within a specific
geographic area, but did so within a general framework set by the department.

The fact that as Chief of Police Services for the City of San Clemente, Hunt had authority
to formulate plans to implement the broad goals of the OCSD within that jurisdiction is important
in assessing the breadth of his job responsibilities.[14]  See *Elrod*, 427 U.S. at 368 (holding that
party affiliation may be an appropriate requirement for an employee who "acts as an advisor or
formulates plans for the implementation of broad goals").  See also *Walker*, 272 F.3d at 1132-33
(concluding that an independent contractor had been "given considerable discretion to implement
the broad goals" of a city's policy, quoting *Pleva v. Norquist*, 195 F.3d 905, 913 (7th Cir. 1999));
*Pleva*, 195 F.3d at 913 (holding that although the zoning board had a number of specific tasks,
it also had "broad discretionary policymaking powers"); *Rice v. Ohio Department of
Transportation*, 14 F.3d 1133, 1142 (6th Cir. 1994) ("At a minimum, however, we take it that
courts are entitled to look at the factors mentioned by Justice Brennan in *Elrod*: the scope of the
employee's responsibilities, the clarity with which those responsibilities are defined, and 'whether
the employee acts as an adviser or formulates plans for the implementation of broad goals,'"
quoting *Elrod*, 427 U.S. at 368); *Thomas v. Carpenter*, 881 F.2d 828, 831 (9th Cir. 1989) ("In
determining whether an employee occupies a policymaking position, consideration should also be
given to whether the employee acts as an adviser or formulates plans for the implementation of
broad goals").

While it cannot be said that Hunt had "relatively unfettered responsibilities," *Walker*, 272
F.3d at 1133, "the fact that [his] position involve[d] a broad range of responsibilities [can also]

---

[12]Interrogatory No. 26.

[13]Interrogatory No. 15.

[14]As discussed *infra*, Hunt's authority to implement the broad goals of the OCSD within
San Clemente is also significant in determining whether he influenced policy or programs.

10

1  lead[ ] to the conclusion that it is political," *Hoard v. Sizemore*, 198 F.3d 205, 216 (6th Cir.

2  1999).  See also *id.* (the fact that the "positions at issue were somewhat amorphous in nature and

3  included a fairly broad range of responsibilities," supported a conclusion that the employees were

4  not protected).  "An employee with responsibilities that are not well defined . . . more likely

5  functions in a policymaking position."  *Elrod*, 427 U.S. at 367-68.

6           Here, as noted, the jury found that, in his role as Chief of Police Services, plaintiff

7  implemented department policy in San Clemente within a framework set by the department.

8  Given that plaintiff oversaw the provision of police services on a citywide basis, and that in doing

9  so, he implemented department policy not according to strict and specific directives but only a

10 "general framework" provided by OCSD, it is appropriate to conclude that he had broad job

11 responsibilities.  This is a critical distinction between plaintiff's position as a lieutenant in the

12 OCSD and the position of the police lieutenant in *Thomas*.  There was no evidence in that case

13 that Thomas had broad responsibility for implementing department policy within a geographic area

14 or division as plaintiff did here.

15          Thomas was a lieutenant in the Santa Barbara Sheriff's Department.  The department's

16 policy and discipline manual defined his position as a "subexecutive" one, and stated that a

17 lieutenant like Thomas had a duty to "carry out department policies and administer and supervise

18 the work of various subdivisions."  *Thomas*, 881 F.2d at 829.   He was not responsible for

19 developing departmental policy, and could recommend policy changes only through the designated

20 chain of command.  *Id.*[15]   The court held that defendant could not "show, based solely on the

21

22          [15]*Thomas* arose in the context of a motion to dismiss, and defendant's *Elrod-Branti* defense
23 was evaluated "solely on the allegations of Thomas's complaint."  *Thomas*, 881 F.2d at 832.
    Defendant based his defense on the job responsibilities that Thomas alleged had been removed
24 from him when he was demoted: (1) his participation in weekly informational staff meetings;
    (2) his role as an evaluator of the department's high risk entry team; and (3) his participation in
25 policy manual revision meetings.  While the Ninth Circuit held that the evaluator role "ha[d] no
26 significant relationship to [Thomas's] political loyalty," its conclusions regarding the first and
    third categories were necessarily preliminary, as they were based on Thomas's allegations that the
27 staff meetings did not involve the formulation of policy, and on factual ambiguities in the record
28 as to whether Thomas's involvement in policy manual revision meetings rose to the level of policy

allegations of Thomas's complaint [concerning his participation in weekly staff meetings and policy manual revision meetings], that Thomas's political loyalty [was] essential to the effective performance of the tasks removed from his list of responsibilities." *Thomas*, 881 F.3d at 832.

While there was testimony in this case that plaintiff had to use the chain of command to recommend policy changes, his position was nonetheless, as the jury's findings make clear, significantly different than Thomas's. The Ninth Circuit's decision in *Thomas* indicates that it is not appropriate to impose political loyalty as a requirement on a lieutenant who has no significant role in setting policy and formulating plans to implement departmental goals. The case does not dictate a similar result with respect to an employee like Hunt, who, by contrast, was more than a lieutenant. Hunt was Chief of Police Services for San Clemente, and had precisely that type of authority within that jurisdiction that Thomas apparently lacked. As the jury's responses to the interrogatories make clear, it was Hunt's position as Chief of Police Services that set him apart from a typical lieutenant in a law enforcement organization like the OCSD. By virtue of that position, he had various types of discretionary authority within San Clemente that made it likely that his principled disagreements with Carona concerning department policies would impede Carona's ability to carry out his political agenda in that city.[16]

_____

formulation. *Id.* ("Carpenter may be able to prove at trial, or perhaps even by summary judgment, that Thomas's political loyalty in each of these positions is needed for the effective implementation of general departmental policy").

[16]Hunt's responsibility for formulating plans to implement the broad goals of the OCSD also distinguishes him from the deputy sheriff in *DiRuzza*. *DiRuzza*, 206 F.3d at 1308 ("Justice Brennan's plurality opinion broadly condemned the constitutional evils of the patronage system, but recognized an exception for 'policymaking positions' where 'the employee acts as an adviser or formulates plans for the implementation of broad goals,'" quoting *Elrod*, 206 F.3d at 367-68). In *DiRuzza*, the Ninth Circuit considered whether it was appropriate to impose political loyalty as a requirement for employment as a deputy sheriff, described as "the lowest ranking peace officers in the department." *Id.* at 1310. DiRuzza did not independently formulate plans to implement broad departmental goals, but assisted a lieutenant in a suit involving conditions at the jails, revising a manual of jail procedures, such as procedures for handling inmates' mail, in order to comply with court-ordered requirements. *Id.* at 1311. The court found "little to support a conclusion that DiRuzza [was] a policymaker," but returned the matter for resolution of outstanding factual disputes and evaluation of the *Fazio* factors. *Id.* Revising a policy manual to

The fact that plaintiff exercised discretionary authority within a framework established by the OCSD does not diminish the fact that he possessed discretionary authority.  Reading the jury's answers to the special interrogatories in combination, it found that, while Hunt's duties were clearly defined, they were duties that had a significant discretionary component that gave him leeway in formulating plans to implement OCSD's goals within San Clemente as he believed appropriate.  Compare, e.g., *Galloza v. Foy*, 389 F.3d 26, 31-32 (1st Cir. 2004) ("These are not purely mechanical or ministerial functions.  They illustrate the wide sweep of discretionary powers inherent in the position of regional administrator.  The responsibilities of a regional administrator, in CRIM's organizational structure, are not narrowly circumscribed, but, rather, are open-ended; they afford the position's occupant considerable leeway for discretionary policymaking and policy implementation"); *Santana v. Calderon*, No. 01-1576 (JP), 2009 WL 890490, *9 (D.P.R. Mar. 30, 2009) ("This description is relatively broad and open-ended.  It describes the Executive Director's role in broad strokes, rather than providing specific details to carefully circumscribe the job responsibilities.  The broad job description is a factor that weighs in favor of finding that the Executive Director is a policymaking position"); *Cottrell v. City of Markham*, No. 00 C 7507, 2003 WL 1563701, *3 (N.D. Ill. 2003) ("First, the description of the position of Superintendent includes a broad scope of responsibilities.  Specifically, the Superintendent 'shall have the management and control of all matters and all things pertaining to public works'" (citation omitted)).

Moreover, the jury's finding that Hunt formulated plans for implementing the broad goals of OCSD within San Clemente makes clear that Hunt had supervisory responsibility for law enforcement in the City of San Clemente, and that he exercised discretion in carrying out that responsibility.  Similarly, the jury found that he had responsibility for maintaining professional relationships with city officials  and good community relations.[17]   These factors also support a

---

comply with a court order does not implicate the sort of discretion or independent authority that plaintiff exercised as Chief of Police Services.

[17]Interrogatories Nos. 20, 21, 30, 31, 32, 33.

finding that it was appropriate to impose political loyalty as a requirement of Hunt's job.  See, e.g., *Diamond v. Chulay*, 811 F.Supp. 1321, 1329 (N.D. Ill. 1993) ("The job also contains broad responsibilities and objectives such as promoting and maintaining professional working relationships with various governmental agencies and public sector organizations and promoting and maintaining effective relations with the community"); *Stott v. Martin*, 783 F.Supp. 970, 986 (E.D.N.C. 1992) ("The Regional Office Manager's supervisory authority over all programs within the region, his participation in the development and implementation of agency, department, and state programs, his responsibility for promoting NRCD programs, and his budget-making responsibilities gave him broad power to control others and influence programs").

The court asked the jury whether the description of Hunt's job found in the section of the Orange County Sheriff's Department Rules and Regulations regarding the duties and responsibilities of OCSD officers,[18] and in the county's job classification for the position of lieutenant[19] were "vaguely worded."  The jury responded in the negative.[20]  *Cokushman v. Village of Ilion, New York*, 317 F.Supp.2d 120, 126 (N.D.N.Y. 2004) ([T]he more vague or broad the description, the more likely the employee works in a policymaking capacity").  While this weighs against a finding that it was appropriate to impose political loyalty as a requirement of Hunt's job, the significance of the jury's view of Hunt's job "description" is undercut by its finding regarding Hunt's actual duties – i.e., his formulation of plans for the implementation of OCSD's broad goals and his exercise of significant discretionary authority within the City of San Clemente.  See *DiRuzza*, 206 F.3d at 1312 ("While it is possible that some deputy sheriffs in California may be policymakers, an analysis of an individual deputy's *actual duties* is necessary to that determination" (emphasis added)); *id.* at 1314 ("[T]he actual duties performed by a deputy sheriff determined whether he or she was a policymaker").

The mere fact that Hunt was responsible for providing law enforcement services to all

---

[18]Exh. 67-38.

[19]Exh. 353.

[20]Interrogatory No. 24.

residents without regard to politics  does not mean that Hunt and Carona could not have principled disagreements about the implementation of department policies.  In fact, the campaign in which Hunt and Carona engaged underscores the existence and extent of the disagreements the two had regarding department policies, police tactics and officer training.  To conclude otherwise, as the court noted in *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985), would be to adopt

> ". . . an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services. . . .  The primary function of any local governmental entity is the provision of services such as police and fire protection, public schools, hospitals, transportation, and libraries, as well as quasi-utility functions such as water, garbage, and sewage services.  Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals about how best to provide services.  While the ultimate goal of all sides might be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal.  Therefore, the fact that plaintiff's position concerned the provision of water to all citizens does not mean that the Water Department had no goals about which there could be principled disagreements." *Tomczak*, 765 F.2d at 641.

What the jury's responses to the interrogatories collectively capture is the fact that Hunt occupied a unique position, operating with independence and authority within a limited geographic area, but exercising limited authority within the department as a whole.  Hunt's regional authority extended to formulating plans for the implementation of the OCSD's goals within San Clemente, and put him in a position where his disagreements with Carona regarding policies, tactics and training had potential to interfere with Carona's ability to pursue his agenda for the department in San Clemente.[21]  Certain interrogatories to which the parties provided stipulated answers supply

---

[21]Interrogatory No. 15.

additional insight regarding the scope of Hunt's discretionary authority.[22]   The answers to these questions establish that Hunt "exercise[d] discretion in making operations decisions in the [C]ity of San Clemente within the confines of the OCSD [R]ules and [R]egulations," that Hunt "manage[d] a subdivision of the OCSD stationed at city hall in the City of San Clemente," and that Hunt had "discretionary authority regarding the deployment of deputy sheriffs within the City of San Clemente."[23]   The parties also stipulated that Hunt did not have final authority to hire the deputy sheriffs who worked under his command or to determine the criteria governing the promotion of employees under his command.[24]   The jury found, however, that Hunt had authority to discipline subordinates under his command in some instances.[25]

Balancing all of the factual findings, the court concludes the first *Fazio* factor weighs in favor of defendant because Hunt's responsibilities as Chief of Police Services were not so circumscribed or cabined that it was inappropriate for Carona to impose political loyalty as a requirement for the effective performance of the position.  Hunt exercised considerable discretion within the City of San Clemente and formulated plans to implement OCSD's goals in that jurisdiction.  As it was Carona's prerogative to set those goals and ensure that they were implemented as he wished, he was entitled to require that Hunt remain politically loyal to him while serving in that position.

### b.    Technical Competence

Although the Ninth Circuit has not elaborated on the technical competence factor, the Second Circuit, which considers a similar component in its *Elrod-Branti* analysis, has held that where an employee holds a position that "requires considerable 'technical competence and

---

[22]These interrogatories were originally prepared for submission to the jury.  Ultimately, however, the parties stipulated to the answers, and agreed that the court could consider the stipulated answers in deciding whether Carona had proved his *Elrod-Branti* defense.

[23]RT at 1050:17-25; 1051:1-6; 1052:5-9.

[24]RT at 1051:20-25; 1052:1-5.

[25]Interrogatory No. 34.

expertise,'" this weighs in favor of a finding that the position is not protected against patronage dismissal. *Bavaro v. Pataki*, 130 F.3d 46, 50 (2d Cir. 1997) (identifying as one factor that weighed in favor of a finding that an employee was not entitled to protection the fact that her job description included the "successful prosecution of professional medical misconduct charges"); see also *Vona v. County of Niagara, N.Y.*, 119 F.3d 201, 209 (2d Cir. 1997) (holding that the position of assistant attorney requires some technical competence and expertise); *Gordon*, 110 F.3d at 890 ("[Plaintiffs] all have technical competence or expertise; each was a consultant to a specific policymaking board"). The First Circuit similarly has identified the fact that a position requires technical competence as a factor weighing in favor of a finding that political loyalty is an appropriate requirement for the position. *Ruiz-Casillas v. Camacho-Morales*, 415 F.3d 127, 132-33 (1st Cir. 2005).[26]

The parties stipulated that Hunt's position as a lieutenant and Chief of Police Services required technical competence. To hold this position, Hunt had to be certified in a number of POST requirements. Given the minimal evidence presented regarding this factor, however, the court notes that technical competence is related to the *Elrod-Branti* analysis only in the sense that "a high level of technical competence indicates that the position is that of a policymaker because the successful implementation of the political administration's policy goals will depend heavily on the employee's technical abilities." *Santana*, 2009 WL 890490 at *10 n. 12. As presented at trial, certification in state POST requirements appears to be the sort of technical competence

___

[26]The First Circuit had previously treated the fact that a position required technical competence as a factor weighing *against* a finding that political loyalty was a necessary requirement of the job. *Ortiz-Pinero v. Rivera-Arroyo*, 84 F.3d 7, 14 (1st Cir. 1996) (noting that plaintiff was "no 'expert' in the financial and accounting aspects of the [agency's] responsibilities. Thus, we think the evidence does not support a fair inference that Ortiz was selected for his managerial or technical expertise. [This, along with other facts] plainly permits a fair inference that he was selected for the [agency] directorship based on his 'political' service and talents"). See *Santana*, 2009 WL 890490 at *10 n. 12 (noting the "inconsistency in the case law within the First Circuit regarding the appropriate method for weighing the factor of technical competence," and following *Ruiz-Casillas* as the more recent case).

that any deputy sheriff must demonstrate to maintain employment in the department.[27]   No evidence was presented that Hunt required specialized technical competence or expertise over and above that of other deputy sheriffs. See *Wallikas v. Harder*, 118 F.Supp.2d 303, 307 (N.D.N.Y. 2000) (finding that the "technical competence" prong was satisfied where employee was "involved with the department['s] computer programs . . . and the job description for Deputy Sheriff Captain suggests that technical competence or expertise in the areas of, *inter alia*, law enforcement, equipment, and criminal law, were necessary to the job"); *Fry v. McCall*, No. 95 Civ.1915(JCK), 1998 WL 770563, *6 (S.D.N.Y. 1998) (finding that "technical competence" weighed in favor of a finding that political loyalty could be required because the position in question "clearly required substantial technical competence or expertise" in that the employee "was probably one of the few people in the state with extensive expertise in municipal budget oversight, managing financial analysts, organizing and editing reports to the Financial Control Board . . . and advising members of the [Board] on technical and policy matter"); *Vona v. County of Niagara*, Nos. 94-CV-43S, 94-CV-71S, 1995 WL 222049, *7 (W.D.N.Y. Mar. 31, 1995) ("Thus, to be qualified for the position, an individual must have a considerable amount of training, technical competence, and expertise"), aff'd 119 F.3d 201 (2d Cir. 1997) ("[T]he position of assistant attorney requires some technical competence and expertise").   Moreover, it is not clear that Hunt was hired as Chief of Police Services "particularly for [his] technical competence in the area" governed by the POST standards. *Walker*, 272 F.3d at 1132.   This factor, therefore, does not weigh in favor or against a finding that political loyalty was an appropriate requirement for Hunt's position as lieutenant assigned as Chief of Police Services for San Clemente.

### c.   Relative Pay

As with technical competence, the "relative pay" associated with the position is a factor that the Ninth Circuit has identified, but on which it has not elaborated. See, e.g., *Walker*, 272 F.3d at 1132.   The *Fazio* court noted without further comment that the attorney in that case earned

---

[27]Exh. 163 ("Applicant must meet all requirements for peace officer status that are mandated by the California Government Code and Peace Officer Standards and Training (P.O.S.T.) regulations  for *lower classes* in this series" (emphasis added)).

more than $100,000 a year.  *Fazio*, 125 F.3d at 1329.  The First Circuit also considers this factor, *Lopez-Quinones v. Puerto Rico National Guard*, 526 F.3d 23, 26 (1st Cir. 2008) (noting without further comment that plaintiff's relatively high annual salary of $30,000 weighed in favor of finding that political loyalty was an appropriate job requirement).[28]

As the factor specifically commands consideration of an employee's pay in relation to the pay of others, it is appropriate to compare plaintiff's pay to that of other employees "whose position[s] [are] indisputably . . . 'political; trust position[s]."  *Ruiz-Casillas*, 415 F.3d at 133 (noting that there was only a $100 pay differential between plaintiff and an employee whose job was undoubtedly political).  In addition, if plaintiff is "one of the highest paid officials in the county, [this] 'tend[s] to signify a position of some influence.'"  *Ecker v. Cohalan*, 542 F.Supp. 896, 902 (E.D.N.Y. 1982) (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)).  Finally, it is appropriate to compare plaintiff's pay to that of an "average career employee."  *Mendez-Aponte v. Puerto Rico*, _ F.Supp.2d _, 2009 WL 3063400, *10 (D.P.R. Sept. 16, 2009) (noting that a $77,000 annual salary exceeded that of an "average career employee," particularly given First Circuit cases stating that an employee who received a $30,000 salary in Puerto Rico was "well paid," quoting *Lopez-Quinones*, 526 F.3d at 28).  See also *Tomczak*, 765 F.2d at 642 ("The sheer size of the Bureau's staff and budget, particularly in light of the fact that his annual $62,000 salary was second highest in the Department, suggests that plaintiff was in a position where his political affiliation could affect the ability of a new administration to implement new policies"); *Santana*, 2009 WL 890490 at *10 ("The Governor sets the salary for the Executive Director of the HRODC, and Santana's salary while holding the position was set at $65,000.00

---

[28]Notably, relative pay is not among the factors considered by the Second Circuit.  *Gordon*, 110 F.3d at 889-90 (listing factors).  On occasion, however, the Second Circuit has noted that "a high salary is 'a common characteristic of policymaking positions.'"  *Adler v. Pataki*, 185 F.3d 35, 46 (2d Cir. 1999) (quoting *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir.1988)).  The Eleventh Circuit, by contrast, has stated that "high salaries are not indicative of a position that requires a particular party affiliation as government employees' pay should be a reflection of competence, ability and experience, rather than a reward for party affiliation."  *Parrish v. Nikolits*, 86 F.3d 1088, 1093 (11th Cir. 1996).

annually.  Relative to other government officials at the time of Santana's appointment, this salary is not so high as to strongly indicate that Santana's role was necessarily considered an important policy-making position, but is also substantial enough to be consistent with the possibility that the Governor viewed the Santana as a significant policymaker.  The Court considers the factor of relative pay to be neutral to our analysis").

The parties agreed that the court should not propound special interrogatories regarding relative pay because evidence had not been introduced on the topic.[29]  The court therefore deems this factor neutral.

### d.    Control Over Others

The next factor identified by the Ninth Circuit as relevant in assessing whether political loyalty is an appropriate requirement for plaintiff's position is his control over others.  See, e.g., *Walker*, 272 F.3d at 1132.  Other circuits too find this factor pertinent to the *Elrod-Branti* analysis.  The First Circuit has noted that the power to control others is a "factor[ ] tending to indicate that one's position involves discretionary judgments, which in turn often entail policymaking."  *Lopez-Quinones*, 526 F.3d at 26.  "[M]erely being a supervisor/administrator[, however,] is not sufficient to show that political affiliation is an appropriate requirement for the job in question."  *Milazzo v. O'Connell*, 108 F.3d 129, 133 n. 1 (7th Cir. 1997).

Rather, the court must evaluate the extent of control plaintiff exercised over other OCSD employees and the nature of the positions those subordinate employees held, as well as the number of employees he supervised.  *Lopez-Quinones*, 526 F.2d at 26 ("Lopez did supervise approximately thirty other employees, but they were mostly janitors and other lower-level employees.  It is hard to see how Lopez' position implicates significant policy issues, let alone 'partisan political interests . . . [or] concerns,'" quoting *Branti*, 445 U.S. at 519).  See also *McCloud v. Testa*, 227 F.3d 424, 429 (6th Cir. 2000) (holding that an employee did not fall within the *Elrod-Branti* exception where he "supervised nine or ten employees, but did not hire or fire them, was not responsible for their raises or granting leaves, and though he conducted

---

[29]RT at 1057:25; 1058:1-2.

20

performance evaluations of them, these were reviewed with the employees by his boss"); *Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir. 1994) (holding that this factor weighed against plaintiff where he "managed about sixty employees and had broad authority to make hiring decisions"). The Fourth Circuit asks whether the plaintiff "possesse[d] the authority to hire and fire other employees." *Galli*, 490 F.3d at 271-72 (although plaintiff supervised and managed a thirteen-person staff, she lacked the ability to make personnel decisions, which among other things, raised triable issues of fact at summary judgment as to whether she held a policymaking position). The Third Circuit also asks whether plaintiff had authority to "hire and fire" employees. *Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1986).

Based on the evidence adduced at trial, it is clear that Hunt supervised approximately 56 employees[30] in his role as Chief of Police Services for the City of San Clemente. As noted, the parties stipulated that Hunt lacked the power to hire the employees under his command or determine criteria for promoting them. He did, however, have authority to manage the deployment of officers under his command. In addition he had the authority, in some instances, to determine the type of discipline to be imposed on subordinates under his command,[31] and he resolved citizen complaints regarding the conduct of the employees he supervised as well.[32] It is thus clear that Hunt had some ability to control subordinates, although he lacked the ability to make certain personnel decisions that courts have found to be relevant. The court therefore finds that this factor weighs only slightly in favor of defendant.

e.      **Authority to Speak for the Sheriff and/or the OCSD**

The fifth factor the Ninth Circuit has identified as relevant to the *Elrod-Branti* analysis is whether and to what extent plaintiff had authority to speak for the Sheriff. See *Gomez v. County of Los Angeles*, 314 Fed. Appx. 928, 929 (9th Cir. Feb. 27, 2009) (Unpub. Disp.) (noting that a lieutenant in the Los Angeles Sheriff's Department had "little authority to speak for the

---

[30]RT at 15-18.

[31]Interrogatory No. 33.

[32]Interrogatory No. 34.

Sheriff"); *Walker*, 272 F.3d at 1133 (the fact that under his contract with the city, an independent contractor did not have authority to speak as the city's agent weighed against a finding that contractor was "in a policymaking position"); *DiRuzza*, 206 F.3d at 1311 (noting as relevant "whether [plaintiff] had the power to control others or the authority to speak in the name of the department"); see also *Galloza v. Foy*, 389 F.3d 26, 29 (1st Cir. 2004) ("To differentiate between policymakers and non-policymakers, we [consider, *inter alia*,] . . . the extent to which the position involves supervision and control over others, [and] the degree to which the position confers authority to speak in the name of higher-ups who themselves are policymakers").

It is appropriate to consider an employee's authority to speak on behalf of his superior not only to the public at large, but to other departments, outside agencies and governmental entities as well. *Nader v. Blair*, 549 F.3d 953, 960-61 (4th Cir. 2008) (holding that an employee who had "daily contact with state personnel," "[met] weekly with the Mayor of Baltimore or other designated executive staff members to share information," and "[met] weekly with state and local finance staff regarding the budget and other fiscal activities" "represent[ed] the agency] in substantive interactions with other departments and outside agencies"); *Lopez-Quinones*, 526 F.3d at 27 ("He did not operate as a spokesperson or otherwise liaise with the public or other government agencies, except in ways largely ministerial"); *Rosenberg v. City of Everett*, 328 F.3d 12, 18 (1st Cir. 2003) ("Among other duties, the Director of ECTV is responsible for negotiating and overseeing the contract with the cable company; working as a liaison between the cable company and the City in settling customer disputes; [and] maintaining open dialogue with the community"); *Gordan v. Cochran*, 116 F.3d 1438, 1440 (11th Cir. 1997) (viewing as relevant the fact that an employee "was authorized to speak in the name of the Sheriff to other elected officials and community leaders"). Thus, courts "place[ ] primary importance [on]whether the employee in question is empowered to act and speak on behalf of a policymaker, especially an elected official." *Gordon*, 110 F.3d at 890 (quoting *Regan v. Boogertman*, 984 F.2d 577, 580 (2d Cir. 1993) ("There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead")).

Courts have phrased this factor as "authority" to speak. Thus, it is significant that the jury

found that Hunt lacked authority to speak with the media without the prior approval of either higher ranking OCSD officers or the OCSD's Public Information Officer.[33]   Of greater significance, however, is the fact that Hunt regularly interacted with the City Council of San Clemente,[34] and with the public.[35]  These facts provide powerful circumstantial evidence that Hunt was in fact authorized to communicate on OCSD's behalf with the public and with elected officials and that, to the extent he required prior approval to speak to the media, that approval was frequently granted.  This factor, therefore, weighs in favor of defendant.

### f.    Public Perception

Also relevant in assessing whether defendant had an adequate justification under *Elrod-Branti* for requiring political loyalty from one in Hunt's position is the "public perception" of that position.  The Ninth Circuit has described this factor as concerned with the public's perception of certain other of the *Fazio* factors, such as whether the public viewed plaintiff as an official representative of the agency or a policymaker, *Walker*, 272 F.3d at 1132 (concluding that the "public would have perceived" the independent contractor as the City's "official" representative), or whether the public perceived that plaintiff had authority to control others or to speak in the name of the department, *DiRuzza*, 206 F.3d at 1311 (weighing as relevant "whether the public perceived that [DiRuzza] had . . . authority" to "control others" or to "speak in the name of the department").  See also *Galloza v. Foy*, 389 F.3d 26, 29 (1st Cir. 2004) (considering "the public perception of what the position entails"); *Hall v. Ford*, 856 F.2d 255, 263 (D.C.Cir. 1988) ("[H]igh level officials must be permitted to accomplish their organizational objectives through key deputies who are loyal, cooperative, willing to carry out their superior's policies, and perceived by the public as sharing their superiors' aims"); *Summe v. Kenton County Clerk's Office*, 626 F.Supp.2d 680, 685-86 (E.D. Ky. 2009) ("The clerk's staff and the public will perceive the chief deputy, by virtue of her position, to be the voice of the clerk, and she will be

---

[33]Interrogatory No. 22.

[34]Interrogatory No. 20.

[35]Interrogatory No. 21; Interrogatory No. 30.

in a position to thwart his policies and hurt him politically and managerially if she is not loyal to him").

The jury found that the public perceived that Hunt represented the OCSD in the City of San Clemente.  Accordingly, this factor weighs in favor of defendant.

### g.     Influence on Programs or Policy

The Ninth Circuit also considers relevant whether plaintiff "substantially influenced" government programs.  In *Walker*, the court noted that an independent contractor's influence over city programs was the "most critical factor" because the City of Lakewood had "delegated total control over its fair housing program to the" contractor.  *Walker*, 272 F.3d at 1132-33.  In *DiRuzza*, by contrast, although the Ninth Circuit remanded based on the presence of triable issues of fact, it appeared to conclude that plaintiff had little influence on programs or policy despite the fact that she drafted a policy manual for a new jail, since her work consisted of "revising an old manual of jail procedures, such as procedures for handling inmates' mail, in order to comply with court-ordered requirements."  *DiRuzza*, 206 F.3d at 1311 (noting that one of the issues the district court should examine on remand was "whether [plaintiff] created or substantially influenced the policy of the sheriff's department"). See also *Galloza*, 389 F.3d at 29 (weighing "the influence of the position over programs and policy initiatives"); *Rosenberg v. City of Everett*, 328 F.3d 12, 18 (1st Cir. 2003) (concluding that plaintiff had influence in "overseeing the budget, programming, and staffing of the station.  The Director establishes and implements all policy for the station and exercises control over all ECTV employees"); *Gordon*, 110 F.3d at 890 (noting that the factor of influencing government programs, along with whether plaintiff is perceived as a policymaker by the public, whether he has contact with elected officials, and whether he is responsive to political leaders, "attempt to define the contours of a zone inside which governmental decisions are made" and establish whether plaintiff is "inside this zone").

The court submitted multiple interrogatories to the jury regarding both Hunt's influence on programs and his formulation of and influence on policy.  These subjects are largely related. The picture painted by the jury's answers is one of a government employee who had substantial

ability to influence law enforcement programs within the City of San Clemente[36] and to influence OCSD policy that affected the City of San Clemente,[37] but who did not act as an advisor to department-wide policymakers such as the Sheriff and Assistant Sheriffs,[38] and who could not formulate or even substantially influence policies department-wide.[39]

Courts have considered whether regional directors of national or statewide programs are policymakers for purposes of *Elrod-Branti*.  The D.C. Circuit, for example, has held that "persons administering huge Federal government programs for an entire state will have a high policy component to their activities, both because such large scale exercise of power usually implicates substantive internal policy, and because such positions are a natural source for influential recommendations of changes in policy."  *Committee to Protect the First Amendment Rights of Employees of the Department of Agriculture v. Bergland*, 626 F.2d 875, 879 (D.C. Cir. 1979).  Similarly, in *Brunston v. United States*, 518 F.Supp. 223 (S.D. Ohio 1981), the court found that "each State Director is a vital cog in the machinery of a new Administration's formulation and implementation of national farm and rural development policies.  More than any other person in the agency, the State Director is in the critical position of insuring either the success or failure of these national policies through the administration of [Farmers Home Administration] programs within his state area.  It is certainly expected that these positions would be filled by individuals who will openly support and aggressively implement the policies of the in-party in the discharge of their duties."  *Id.* at 239.

In considering the role of a Regional Director for a housing program in Puerto Rico, the First Circuit held that the directors "'develop[ed], plan[ned], coordinate[d], revise[d], and monitor[ed] the progress of the agency's programs and thus gauge[d] the success of the Administration's [Commonwealth] policies,'" *Jimenez Fuentes*, 807 F.2d at 246 (quoting

---

[36]Interrogatory No. 23.

[37]Interrogatory No. 9.

[38]Interrogatories Nos. 1-2.

[39]Interrogatories Nos. 6-7, 10-11.

*Brunston*, 518 F.Supp. at 239).  It concluded that, "[w]ithout the Regional Directors' political sympathy and loyal cooperation, the Executive Director 'might face a situation where the hostile efforts or foot-dragging actions of any one of the [eleven Regional Directors] could singlehandedly thwart the Administration's goals in that particular [region].'"  *Id.* (quoting *Brunston*, 518 F.Supp. at 239).

The court does not read these cases as holding that the director of a regional subdivision is invariably a policymaker.  Nor does the court read the cases as holding that the director of a regional subdivision invariably lacks policymaking authority because he is not geographically situated in headquarters with the final policymakers. "Under the rationale in *Branti*," of course, "a public employee need not literally make policy in order to fit within the *Elrod* policymaker exception.  Rather, an employer may fire a public employee for purely political reasons if the employer can demonstrate that political considerations are 'appropriate requirement[s] for the effective performance' of the job," See *Fazio*, 125 F.3d at 1332 (quoting *Branti*, 445 U.S. at 518).  As respects regional directors or managers, the question is best viewed as whether it ought reasonably to be "expected that these positions would be filled by individuals who will openly support and aggressively implement the policies of the in-party in the discharge of their duties," *Brunston*, 518 F.Supp. at 239, and whether the final policymaking authority "might face a situation where the hostile efforts or foot-dragging actions of any one" of his regional directors or managers "could singlehandedly thwart the Administration's goals in that particular [region]," *Jimenez Fuentes*, 807 F.2d at 246.

Here, Hunt exercised discretion regarding the manner in which the policies of the OCSD should be implemented in the City of San Clemente;[40] he substantially influenced OCSD policy that affected the City;[41] he formulated plans to implement the broad goals of the OCSD in the

---

[40]Interrogatory No. 5.

[41]Interrogatory No. 9.

City;[42] and he substantially influenced law enforcement programs throughout the City.[43]  Given that the Chief of Police Services for San Clemente formulated plans to implement his department's broad goals within the city, and substantially influenced law enforcement programs there, the court is compelled to conclude that it was reasonable to expect that the person holding that position would be supportive of the Sheriff's policies, implement them aggressively, and not engage in "foot-dragging" with respect to them.   Stated differently, it was appropriate to make political loyalty a requirement for the job.  The court thus finds that this factor weighs in favor of the defendant.

### h.    Contact with Elected Officials and Responsiveness to Political Leaders

The Ninth Circuit considers as a separate factor plaintiff's contact with elected officials and his responsiveness to political leaders.[44]   *Walker*, 272 F.3d at 1132-33 (concluding that an independent contractor had "limited contact with elected officials"); *Biggs*, 189 F.3d at 996 (noting that plaintiff "attended three Redlands City Council meetings in order to present reports on various legal issues, which reflected the results of her legal research and analysis.  Julie Biggs also worked with Redlands staff, the city manager, and two city council members on a sludge processing plant through the first part of 1990, which required Julie Biggs to attend a closed city council meeting").  See also *Nader*, 549 F.3d at 960 (holding that this factor weighed in favor of a finding that political affiliation was an appropriate requirement for an employee's job because the employee had "daily contract with state personnel" and "[met] weekly with the Mayor of Baltimore or other designated executive staff members"); *Vezzetti*, 22 F.3d at 486 ("As a department head, Vezzetti consulted directly with elected officials of the Town Board on budgets

---

[42]Interrogatory No. 15.

[43]Interrogatory No. 23.

[44]Courts also consider plaintiff's responsiveness to partisan political concerns.  There was no evidence in this case that Hunt acted on the basis of partisan political views.  *Walker*, 272 F.3d at 1132-33 (noting that under its contract, plaintiff was to be "politically neutral, rather than responsive to partisan politics and political leaders").

and programs (such as the vehicle replacement program)"); *Beckmann v. Darden*, 351 F.Supp.2d 139, 144 (S.D.N.Y. 2004 ) ("[S]ince the work of Assessor is performed under the general direction of the Village Board or Mayor, it clearly involves contact with elected officials").

While the jury found that Hunt did not have significant contact with Carona,[45] it concluded that he had regular interactions with the City Council of the City of San Clemente[46] and that Hunt was required to be responsive to the members of San Clemente's City Council and/or other political leaders in Orange County.[47]  Consequently, this factor weighs in favor of defendant.

> **2.      Whether, Balancing the Relevant Factors, Defendant Demonstrated that Political Loyalty Was an Appropriate Requirement for the Effective Performance of Hunt's Public Office**

Although there are several relevant factors to consider, the "ultimate inquiry . . . is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. Considering the totality of factors, the court concludes that Hunt was in a position for which political loyalty was an appropriate requirement.  In reaching this conclusion, the court finds the two most critical factors appear to be Hunt's responsibility for formulating plans to implement OCSD policy within the City of San Clemente, his ability substantially to influence OCSD policy that affected the city as well as law enforcement programs in the city, his ability to speak on the Sheriff's behalf to elected officials and citizens of the city, and the public's perception that he represented the OCSD in San Clemente.  See *Gordon*, 110 F.3d at 890 (noting that, in combination, whether plaintiff influenced government programs, whether he was perceived as a

---

[45]Interrogatory No. 1 (finding Hunt did not act as an advisor to Carona); Interrogatory No. 17 (finding that Carona did not regularly communicate with Hunt regarding his or the department's expectations, goals, and objectives); Interrogatory No. 18 (finding that it was an unusual occurrence for Carona and Hunt to speak regarding the department's expectations, goals, and objectives).

[46]Interrogatory No. 20.

[47]Interrogatory No. 32.

policymaker by the public, whether he had contact with elected officials, and whether he was responsive to political leaders "attempt to define the contours of a zone inside which governmental decisions are made"). As the court's discussion has illustrated, had Hunt's position been held by an employee motivated to stymie Carona's efforts through hostile efforts or foot-dragging, Carona would have been placed in the untenable position of policies for which he had advocated during the election thwarted and not implemented within a city under his jurisdiction.

The *Elrod-Branti* inquiry does not require a finding that Hunt actually engaged in hostile efforts or foot-dragging, or even that he failed openly to support and aggressively to implement Carona's policies.[48] Rather, the test calls for an examination of the nature of the employee's duties and responsibilities in order to determine whether it was appropriate to impose political loyalty as a requirement for the position. Thus, the question is whether, given his interaction with the public and political leaders in the City of San Clemente, his influence over law enforcement programs and policy that affected San Clemente, his authority to formulate plans to implement the broad goals of the OCSD in the city, and by his authority to speak for the OCSD and the Sheriff, Hunt *could have* stood in the way of Carona's effective implementation of his policies in the City of San Clemente. Based on the factual findings of the jury, the court believes this legal question must be answered yes. The Chief of Police Services for the City of San Clemente had sufficient authority to thwart or interfere with the Sheriff's implementation of the policies he set for OCSD in the city. Consequently, it was reasonable for the Sheriff to require that the employee who held that post be politically loyal to him.

## B. Qualified Immunity

### 1. Legal Standard Governing Qualified Immunity

Qualified immunity shields government officials from § 1983 liability for "performing discretionary functions . . . [so long] as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

---

[48]This would, however, be a relevant inquiry in determining whether the public employee's conduct caused an actual, material, and substantial disruption under *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).

457 U.S. 800, 818-19 (1982).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken."  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); see also *Pierce v. Multnomah County*, 76 F.3d 1032, 1038 (9th Cir. 1996).  The doctrine is designed to reduce the "social costs" of lawsuits filed against state actors, see *Harlow*, 457 U.S. at 814, and protect from liability "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a framework for courts to use in determining whether officials are entitled to qualified immunity.  It directed that the court first ask a threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201; see also *Doe v. Lebbos*, 348 F.3d 820, 826 (9th Cir. 2003) ("Under [*Saucier*], we must ask whether, viewed in the light most favorable to the [plaintiffs], the facts alleged show that [defendant's] actions violated a constitutional right," quoting *Saucier*, 533 U.S. at 200-02); *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001) ("[T]he [*Saucier*] Court held that the required first step in the analysis is to consider the materials submitted in support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would be violated if all facts are viewed in favor of the party opposing summary judgment").

The second question under *Saucier* is whether the right at issue was clearly established.  See *Saucier*, 533 U.S. at 201.  In deciding whether a particular constitutional right was clearly established at the time of the incident, the court must define the right with reasonable particularity, i.e., "[t]he contours of the right must [have] be[en] sufficiently clear [at the time of the violation] that a reasonable official would understand that what he [did] violate[d] that right."  *Anderson*, 483 U.S. at 640; see also *Saucier*, 533 U.S. at 202.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent."  *Anderson*, 483 U.S. at 640 (citations omitted); see also, e.g., *Eng v. Cooley*, 552 F.3d 1062, 1076

(9th Cir. 2009) ("Because this case involved 'mere application of settled law to a new factual permutation,' . . . we conclude that Eng's personal First Amendment interest in Geragos's speech was clearly established by 2003," quoting *Porter v. Bowen*, 496 F.3d 1009, 1026 (9th Cir. 2007))

The third and final step of the *Saucier* analysis requires that the court ask whether the defendant could reasonably but mistakenly have believed that his conduct did not violate a clearly established constitutional right.[49]  See *Brosseau v. Haugen*, 543 U.S. 194, 205 (2004); see also *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (stating that this aspect of the *Saucier* test examines "the reasonableness of [defendant's] belief in the *legality* of his actions"). The overarching and dispositive inquiry for qualified immunity purposes is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.[50]

---

[49]The Ninth Circuit has variously referred to the *Saucier* framework as a two- or three-part test.  Compare *Lebbos*, 348 F.3d at 826 (two-part test), and *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (same), with *Skoog v. Warden of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (three-part test), and *Hydrick v. Hunter*, 466 F.3d 676, 690 (9th Cir. 2006) (same).  The difference is immaterial, however, as those cases that have employed a two-prong formulation have collapsed the second and third steps into a single inquiry.

[50]In *Pearson v. Callahan*, __ U.S. __ 129 S.Ct. 808 (2009), the Supreme Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 818.  The Court concluded that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the  particular case at hand." *Id.*  It stated:

"Although the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development.  For one thing, there are cases in which the constitutional question is so fact-bound that the decision provides little guidance for future cases." *Id.* at 819.

Thus, the law is not developed in a meaningful fashion by decision of a constitutional inquiry that "involves a . . . question which is highly idiosyncratic and heavily dependent on the facts." *Id.* (quoting *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006)).

To the extent that *Pearson* is concerned with proper allocation of scarce judicial resources, it appears to be inapposite here, where there has already been a full trial on the merits.  The case would have been more relevant had defendant raised qualified immunity in his motion for summary judgment.

### 2.    Whether Defendant Is Entitled to Qualified Immunity

Although the court has found that Carona did not violate Hunt's constitutional rights, it holds, in the alternative, that to the extent a constitutional violation occurred, defendant is entitled to qualified immunity.

"[Q]ualified immunity is a question of law, not a question of fact." *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008).  Defendant is "only entitled to qualified immunity as a matter of law if, taking the facts in the light most favorable to [plaintiff, he] violated no clearly established constitutional right." *Id.*  In *Torres*, the court considered whether qualified immunity is a question for the court or for the jury when a trial on the facts has completed. Evaluating prior precedent, it concluded that "*where the material, historical facts are not in dispute*, and the only disputes involve what inferences may be drawn from these historical facts, it is appropriate for [the] court to decide" the question of qualified immunity. *Id.* (quoting *Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003) (emphasis original)).  Following the jury's provision of answers to the court's special interrogatories, there are issues of material, historical fact that are in dispute.  Thus, it is for the court to determine whether defendant is entitled to qualified immunity.

As noted, where a constitutional violation has occurred, the court must ask whether the right violated was clearly established at the time of the defendant's acts.  The test for determining whether a law is clearly established "requires more than an alleged violation of extremely abstract rights." *Tribble v. Gardner*, 860 F.2d 321, 324 (9th Cir.1988) (citations omitted).  Rather,

> "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citations omitted).

*Elrod* and *Branti* were decided by the Supreme Court in 1976 and 1980 respectively, and prior to 2006, the Ninth Circuit held prior to 2006 that "it was clearly established that a

non-policymaking public employee in a sheriff's office is protected from retaliation for the exercise of First Amendment rights." *DiRuzza*, 206 F.3d at 1313.  The *DiRuzza* court decided the issue of qualified immunity on a motion for summary judgment, drawing all reasonable inferences in the plaintiff's favor and declining to "speculate . . . on the merits of the qualified immunity argument under the facts that might be developed at trial." *Id.* at 1314.  Nonetheless, several aspects of the decision provide guidance in this case.  First, the court presumed that the defendant-supervisor knew plaintiff's job duties. *Id.* Here too, Carona is charged with knowledge of the nature of Hunt's job responsibilities as delineated in the jury's answers to the special interrogatories.  Second, the Ninth Circuit concluded that it "was clearly established, as a matter of law, that the actual duties performed by a [public employee] determined whether he or she was a policymaker and therefore subject to partisan dismissal, or a non-policymaker and therefore protected from such dismissal." *Id.* at 1313-14.  The jury's responses focused squarely on Hunt's actual duties, not on theoretical job descriptions.[51]

"The qualified immunity defense depends on whether the nature of [Hunt's] position was such that defendants were entitled to consider his political affiliation as a job qualification and, even if they were not, whether a reasonable officer at the time would have understood patronage dismissal to be barred." *Lopez-Quinones*, 526 F.3d at 25.  Thus, "[t]he crucial question here is whether a reasonable official acting at the time of [Hunt's] termination should have known on what side of the *Elrod/Branti* line [*Hunt's*] *own position fell*." *Id.* at 27.  Stated differently, the court must ask whether Carona could reasonably but mistakenly have believed that it was legally appropriate to make political loyalty a requirement of Hunt's job.  See *Brosseau*, 543 U.S. at 205; *Wilkins*, 350 F.3d at 955.  See also *Lopez-Quinones*, 526 F.3d at 27 (noting that "it is not enough to defeat qualified immunity" that "the abstract right of a non-policy-related employee to be free from politically motivated termination dates from *Elrod* and *Branti*," because "[t]he purpose of qualified immunity is to protect reasonable, if mistaken, decision making by government officials,

---

[51]The only exception is the jury's answer to Question No. 24, which asked whether plaintiff's "job descriptions . . . were vaguely worded." (Interrogatory No. 24.)

. . . and it does not matter whether the mistake is related to broad principle or specific application").

Viewed against the backdrop of the available case law, the position of Chief of Police Services appears to be somewhat *sui generis*. The court has described the jury's findings regarding the nature and duties of the position. The crucial distinction between Hunt's position and others considered by the Ninth Circuit and district courts in the circuit is the fact that Hunt had substantial influence over the implementation of OCSD policy within the City of San Clemente, and served as the face of the department for elected officials and the public in that area. While that the Ninth Circuit has not addressed such a position, the First Circuit recently stated "that 'in every case concerning regional directors of government agencies in Puerto Rico, we have concluded, at least for purposes of qualified immunity, that a regional director was, in fact, a policymaker.'" *Lopez-Quinones*, 526 F.3d at 28 (quoting *Roman Melendez v. Inclan*, 826 F.2d 130, 134 (1st Cir. 1987)).

Given the unique nature of the position, the court concludes that Carona could reasonably, even if mistakenly, have believed that it was constitutional to impose a political loyalty requirement on Hunt's job.[52] The case does not concern the type of police lieutenant position at

_____

[52]The court might alternatively say that whether it was constitutional to impose a political loyalty requirement on Hunt's position was not clearly established as of 2006. See *Lopez-Quinones*, 526 F.3d at 28 (noting the lack of cases addressing analogous positions, and stating that "[g]iven past precedent, we cannot say it was clearly established that Lopez, a director of a significant unit within the Puerto Rico National Guard, was insulated from political dismissal"). See also *Lebbos*, 348 F.3d at 826 (collapsing the second and third steps of the *Saucier* test); *Jackson*, 268 F.3d at 651 (same). It is true that the Ninth Circuit has held that "[i]t is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendant's actions] was apparent in light of preexisting law." *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir. 1995) (citing *Anderson*, 483 U.S. at 640). See also *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000) ("Closely analogous preexisting case law is not required to show that a right was clearly established"). Given the differences between Hunt's duties and those of police lieutenants who prevailed in First Amendment retaliation cases, see *Gomez*, 314 Fed. Appx. at 930; *DiRuzza*, 206 F.3d at 1313, however, the court does not believe that any illegality was obvious in light of preexisting law. Compare *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) ("In other words, while there may be no published cases holding similar policies constitutional, this may be due more to the obviousness of the illegality than the novelty of the

issue in *DiRuzza*, 206 F.3d at 1313 (concluding "'that a lieutenant in a sheriff's office was not necessarily a policymaker'") or *Gomez*, 314 Fed. Appx. at 930.   Rather, the position had aspects that, applying the *Fazio* factors,[53] and considering the First Circuit's jurisprudence on regional directors, could have led a reasonable official in Carona's position to conclude that Hunt qualified as a policymaker for purposes of *Elrod-Branti*.   Whiel it is true that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), "this case does not involve the mere application of settled law to a new factual permutation.   To the contrary, [it requires] wrestl[ing] with difficult and unsettled questions about the First Amendment interests implicated" when a public employee with significant influence over regional programs and policies but not department-wide policies is demoted because he is not politically loyal to his superior.   *Porter*, 496 F.3d at 1026.

Taking these considerations into account, the court thus holds alternatively that, if Hunt's First Amendment rights were violated, Carona is entitled to qualified immunity.   Simply put, "[h]e did not have 'fair warning' that his actions were unconstitutional, . . . nor would a 'reasonable official' in his position have understood" that his conduct "constituted a violation of the First Amendment."   *Id.* (quoting *Hope*, 536 U.S. at 740, and *Anderson*, 483 U.S. at 640).   To defeat Carona's qualified immunity claim, Hunt "had to show that the policy was such a far cry from what any reasonable . . . official could have believed was legal that the defendant[ ] knew or should have known [he was] breaking the law. [Here,] [h]owever, it is entirely

---

legal issue").

[53]In considering qualified immunity in the context of the *Pickering* balancing test, the Ninth Circuit has noted that because the test "requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Gilbrook v. City of Westminster* 177 F.3d 839, 867 (9th Cir. 1999) (quoting *Brewster v. Board of Education of Lynwood Unified School District*, 149 F.3d 971, 979 (9th Cir. 1998)).   The same may be true where prior cases have not addressed a position analogous to plaintiff's under *Elrod-Branti*.   Because there was no on-point authority at the time Carona made his decision regarding Hunt's demotion, he had to apply the nine-factor balancing test articulated by the Ninth Circuit and other circuits to guide, which, like the *Pickering* test, is fact-sensitive and context-specific.

reasonable that the defendant[ ] could have thought that the policy would pass muster under" *Elrod-Branti* and its progeny.  *Sorrels*, 290 F.3d at 971.

## CONCLUSION

For the foregoing reasons, and the reasons stated in the court's oral ruling, defendant's motion for judgment as a matter of law is granted.

DATED: January 15, 2010

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE